UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
ANN CORREALE-ENGLEHART,

        :

        Plaintiff,             **REPORT AND**

        :         **RECOMMENDATION**

   -v-

        :    07 Civ. 3113 (RJS)(MHD)

MICHAEL J. ASTRUE,        :
Commissioner of Social Security,

        :

        Defendant.
------------------------------------x

**TO THE HONORABLE RICHARD J. SULLIVAN, U.S.D.J.:**

Plaintiff Ann Correale-Englehart commenced this action
pursuant to Title II of the Social Security Act, to challenge a
June 2006 decision by the Commissioner of the Social Security
Administration (the "SSA"), denying her disability insurance
benefits under the Social Security Act (the "Act"). Both parties
have moved, pursuant to Fed. R. Civ. P. 12(c), for judgment on the
pleadings. Plaintiff seeks an order reversing the Commissioner's
determination that she is not disabled and remanding for an award
of benefits or at least for reconsideration of the agency decision.
Defendant seeks dismissal of the complaint based on the contention
that his denial of benefits to Mrs. Correale-Englehart is supported
by substantial evidence and is otherwise in accordance with
applicable laws and regulations. For the reasons set forth below,
we recommend that the plaintiff's motion be granted in part and the

1

case remanded for further administrative consideration.

## **PROCEDURAL HISTORY**

Plaintiff filed an application for disability insurance benefits under Title II of the Act on June 14, 2004. (Admin. R. Tr. ("Tr.") 19-21, 50). In plaintiff's Disability Report, dated July 20, 2004, she reported that she suffered from cervical and lumbar disk injuries with nerve impingement, a torn right rotator cuff with nerve damage, a leg injury and bilateral carpal tunnel syndrome, all as a result of a motor vehicle accident that occurred on August 15, 2003. (Id. at 72, 75).

The SSA initially denied her application on December 6, 2004. (Id. at 22-25). It found that the "medical evidence show[ed] [plaintiff has] had stiffness with some restriction of [her] activities, headaches and some difficulty in stressful situations," but concluded that she could still perform her usual duties as a secretary and office manager at her prior job. (Id.). Plaintiff then requested a hearing on her application. (Id. at 31). The hearing was initially scheduled for October 20, 2005, but was postponed until December 8, 2005. (Id. at 37-40, 44).

On December 8, 2005, plaintiff appeared with counsel before

2

Administrative Law Judge ("ALJ") Dennis G. Katz. (Id. at 332). On June 15, 2006, ALJ Katz issued a decision finding that plaintiff was not disabled. (Id. at 8). In short, the ALJ found that plaintiff suffered from a severe back impairment and could not perform her past relevant work, but that there were alternate job opportunities, involving restricted sedentary work, that she could perform with certain limitations. (Id. at 13, 17).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council on June 27, 2006. (Id. at 7). That request was denied on December 8, 2006. (Id. at 5).

Plaintiff then filed this lawsuit pursuant to 42 U.S.C. § 405(g) on April 18, 2007, seeking review of the SSA's decision. (Compl. 1-2).

She filed a motion for judgment on the pleadings on November 1, 2007, seeking a reversal of the SSA's decision with remand solely for the calculation of benefits. (Pl.'s Mem. of Law ("Pl.'s Mem.") 11). The Commissioner responded by filing a cross-motion for judgment on the pleadings on December 14, 2007. (Def.'s Mem. of Law in Supp. of Mot. for J. on the Pleadings ("Def.'s Mem.") 25). He seeks an order affirming his decision that plaintiff is not disabled. (Id.).

3

**FACTUAL BACKGROUND**

I.   Non-Medical Evidence

Plaintiff submitted several disability reports during the course of her application for disability insurance benefits that provided information regarding her background, work history and claimed medical and psychiatric conditions. (Tr. 50, 71, 89, 106). She was born in the United States on February 18, 1963. (Id. at 50). She speaks English. (Id. at 71). She has a high school diploma and has completed three years of college, but did not receive a college degree. (Id. at 78, 210). She is married, has no children other than a 17-year-old step-daughter, and lives with her husband. (Id. at 52, 343).

Plaintiff's work history included employment as a secretary and office manager of Glass Company, a company that repairs windows. (Id. at 73, 334-35). She began working at Glass Company in 1985 and worked there until she sustained injuries in a motor vehicle accident on August 15, 2003. (Id.). As a secretary and office manager, plaintiff stated that she earned $18.00 per hour and worked approximately an eight-hour day, five days a week. (Id. at 73). She subsequently was laid off because she could not work, and was receiving no-fault insurance payments as a result of the

4

motor vehicle accident. (Id. 338).

Plaintiff described her typical work duties at Glass Company as consisting of answering phones, negotiating sales, accepting deliveries, placing orders, data entry, performing administrative duties and walking customers into the building. (Id. at 73, 92). She also stated that she lifted approximately ten to twenty-five pounds frequently during the workday. (Id.).[1] In plaintiff's Function Report, dated August 21, 2004, she listed her daily activities prior to the motor vehicle accident as consisting of sitting, bending, carrying, pulling, writing, using the computer, bowling, coaching softball, working at her desk, standing and sleeping. (Id. at 96).

Since the motor vehicle accident, plaintiff reported in her Function Report that she experienced difficulties with these daily activities because of pain in her right shoulder, right arm, right hip, right leg, neck and back. (Id. at 103). She also reported headaches, resulting in attention problems. (Id. at 101). She described the following abilities as "very limited" since the motor vehicle accident: lifting, standing, walking, sitting, climbing

---

[1] In plaintiff's Disability Report dated July 20, 2004, she stated that she frequently lifted 25 pounds. (Tr. 73). In plaintiff's Work History Report dated August 21, 2004, she responded that she frequently lifted 10 pounds, and that the heaviest weight she lifted was 25 pounds. (Id. at 92).

5

stairs, kneeling, squatting, reaching and using her hands. (Id. at 100). She also reported that she has difficulty sleeping because she must bend her knees; she cannot sleep on her back, right side or stomach; and she wakes up approximately every two hours due to pain. (Id. at 96). She stated that she uses a sleeping pillow wedge for her head, back and knees and a lumbar pillow for sitting. (Id. at 101).

Plaintiff listed limitations on various household activities in her Function Report. (Id. at 96-99). She reported experiencing difficulty with cooking, and as a result, she orders out and rarely makes anything other than a sandwich or a salad. (Id. at 96). She generally no longer does the shopping, and if she does, she needs assistance. (Id. at 99). She also reported that she is unable to clean her home, and instead hired household help, as recommended by her doctors. (Id. at 98).

Plaintiff described a typical day after the motor vehicle accident as consisting of waking up, taking her medication, going to medical appointments and undergoing physical therapy as well as home exercise. (Id. at 96). Initially after the motor vehicle accident, she stated that she could not bathe and dress without assistance. (Id.). She indicated, however, that she could now do these things without assistance, but that it takes more time and

6

she needs to sit more often. (Id.). In addition, plaintiff reported not being able to blow-dry her hair and experiencing difficulty brushing it. (Id. at 97).

Regarding plaintiff's post-accident social life, she reported that she no longer goes out to dinner or the movies with her friends because she cannot sit or stand for long periods of time. (Id. at 100). She said that she could only walk one to two blocks before needing to take a break when walking downhill, and that she needed to rest more frequently when walking uphill. (Id. at 101). As a result of not being able to lead the life that she once led, plaintiff stated that she felt depressed. (Id. at 102). She stated that she is never able to finish what she starts due to pain. (Id. at 101). She also reported that she can drive, but only for a limited time due to pain. (Id. at 98).

Lastly, plaintiff reported in her Function Report and Disability Report that she took various pain medications, including Vicodin, Celebrex, Ambien, amitriptyline and tizanidine daily.[2] (Id. at 104, 77). She described the side effects from these medications as light-headedness, dizziness and lethargy. (Id.).

---

[2] In filling out this form, plaintiff did not specify her dosage for any of her medications.

7

Plaintiff had surgery on her right shoulder in January 2004. She testified, however, that her pain had not improved. (Id. at 345).

## II. The Medical Evidence Before the ALJ

The record reflects a voluminous history of treatment for a variety of physical ailments resulting from the motor vehicle accident, as well as an assessment of psychological impairments that are attributed to those physical ailments. We first summarize plaintiff's physical conditions, including her orthopedic and neurological history, and then turn to her mental-health history.

### A. Physical Conditions

#### 1. Treating Physicians

On August 15, 2003, plaintiff sought emergency treatment at Jacobi Medical Center after being involved in a motor vehicle accident.[3] (Id. at 117-20). Plaintiff was a passenger in a car that was struck on the passenger side by another car, which reportedly ran a red light. (Id. at 119). She was thrown and struck her head,

---

[3] It is unclear from the reports who the treating physician was during the emergency visit to Jacobi Medical Center.

8

suffering neck, low-back, right-shoulder, right-elbow and right-knee injuries. (See id. at 117, 264). According to plaintiff, X-rays taken at Jacobi Medical Center were negative for fractures or dislocation. (Id. at 264).

Dr. Jane S. Bennett, of New Rochelle Radiology, took X-rays of plaintiff's cervical spine, lumbar spine, right knee and right elbow on September 10, 2003. (Id. at 121-24). These preliminary X-rays were normal. (Id.). However, subsequent magnetic resonance imaging studies ("MRI") taken in September 2003 by Dr. Timothy J. Greenan and Dr. Steven W. Winter, of Open MRI of Eastchester, indicated a series of spinal problems. (Id. at 125-29). The MRI of the cervical spine showed "C4-C5 and C5-C6 central and right predominant posterolateral[4] disc protrusions associated with right greater than left foraminal narrowing."[5] (Id. at 129). It also showed "straightening of the cervical lordosis[,][6] which may be

---

[4] "Posterolateral" means "situated posteriorly and to one side." Dorland's Illustrated Medical Dictionary, 1340 (28th ed. 1994).

[5] "Forminal narrowing" refers to a partial blockage of "an opening in a vertebra through which the nerve roots leave the spine ... causing a painful compression of the nerves." Available at http://www.spinaldisorders.com/spinal/index.php?option=com _content&task=view&id=43&Itemid=40.

[6] "Lordosis" is a condition of "the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side. The term is used to refer to abnormally increased curvature." Dorland's, at 960.

9

attributed to muscular spasm." (Id.). The MRI of the lumbar spine showed an "L4-L5 central [herniated nucleus pulposus] right predominant[7] associated with a radial annular tear," an "L4-L5 moderate right lateral recess stenosis and mild central and left lateral recess stenosis"[8] and a "right L5 descending nerve root [that was] deviated posteriorly at the L4-L5 level." (Id. at 127). The MRI of the right shoulder showed an "anterior supraspinatus[9] tendinosis[10] without tear" and a "slight type II configuration of the anterior acromion without overt impingement."[11] (Id. at 126). Finally, the MRI of the right knee showed a "joint effusion,"[12] but

___

[7] A "herniated nucleus pulposus" is a "rupture or prolapse of the nucleus pulposus." A "nucleus pulposus" is a "pulpy nucleus of intervertebral disk: a semifluid mass of fine white and elastic fibers that forms the central portion of an intervertebral disk; it has been regarded as the persistent remains of the embryonic notochord." Dorland's, at 759, 1159.

[8] "Stenosis" refers to the "narrowing or stricture of a duct or canal." In the spine, such narrowing is "caused by encroachment of bone upon the space." Dorland's, at 1576.

[9] "Supraspinatus" refers to "tenderness over the supraspinatus tendon, a painful arc on movement of the arm, and a reversal of scapulohumeral rhythm." Dorland's, at 1641.

[10] "Tendinosis" can occur in "many different tendons ... [including] the hand, wrist, forearm, elbow, shoulder, knee, and heel" and is a "chronic injury of [the tendon that has] failed healing ... it is the inability of the tendon to heal that perpetuates the pain." Available at http://www.tendinosis.org

[11] "Acromion" refers to the "lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder." Dorland's, at 20.

[12] "Effusion" means the "escape of fluid into a part or tissue, as an exudation or a transudation." Dorland's, at 31.

10

no evidence of a "meniscal tear." (Id. at 125).

Dr. Barry Sloan, of Metro-Med, conducted a nerve test on plaintiff on October 2, 2003. (Id. at 132-38). Dr. Sloan concluded that plaintiff had "bilateral L4[-]L5 and/or L5[-]S1 radiculitis" and "C5-C6 radiculitis."[13] (Id. at 138). His report also mentioned that plaintiff had "bilateral carpel tunnel syndrome." (Id.). At this time, plaintiff complained that she was experiencing "neck pain to right upper extremity," that her right upper extremity and right hand felt "weak [and] numb...with tingling" and that she had "low back pain [in her] right lower extremity to [her] knee with intermittent weakness, numbness, and tingling of her right lower extremity." (Id.).

Dr. Stanley Holstein, a neurologist, conducted a comprehensive neurological consultation of plaintiff at the request of Vito Guarino, a chiropractor who had seen plaintiff a handful of times in September 2003. (Id. at 139). Dr. Holstein reported that plaintiff had "cervical and lumbar radiculopathy and concussion secondary trauma"[14] due to the motor vehicle accident. (Id. at 140).

---

[13] "Radiculitis" refers to "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's, at 1404.

[14] "Radiculopathy" is a disease of the nerve roots. Dorland's, at 1404.

11

Dr. Holstein also noted right-arm weakness, reduced pin sensation on the right side, reduced reflexes, impaired gait[15] on her toes and heels, cervical and lumbar muscle spasms, weakness of the right lower limb, straight-leg raising directed to sixty degrees forward and bending only to forty-five degrees.[16] (Id.). He recommended that plaintiff undergo physical therapy with cervical and lumbar traction. (Id.). At this time, plaintiff complained of tingling parasthesias[17], neck pain, arm pain, back pain and leg pain. (Id. at 139). Plaintiff also complained of stiffness in her spine and reported that she was having difficulty sleeping. (Id.).

Dr. Michael Palmeri, an orthopedic surgeon, evaluated plaintiff twenty-five times from September 9, 2003 to June 27,

---

[15] "Gait" refers to the "manner or style of walking." Dorland's, at 671.

[16] "Straight-leg raising is used as a diagnostic test for both elastogenic (passive muscle stretch test) and nonelastogenic (Lasègue's test) pathology in patients unable to bend forward from the standing position while holding the knees in extension. The test assessment is based on the range of the leg excursion and the type of pain that is provoked." L.N. Goeken & A.L. Hof, Instrumental Leg Raising: Results in Patients, 75(4) Arch Phys Med Rehabil. 470, 470 (1994), available at http://www.ncbi.nlm. Nih.gov/pubmed/8172510.

[17] Dr. Holstein's report states that plaintiff complained of "parathesias." (Tr. 139). However, that seems to be a typographical error. "Paresthesias" refers to "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's, at 1234.

12

2006. (Id. at 267-314, 359).[18] Dr. Palmeri also performed surgery on plaintiff's right shoulder on January 16, 2004. (Id. at 287-89).

On September 9, 2003, Dr. Palmeri described plaintiff as a "pleasant 40-year-old right hand dominant female," who suffered from headaches and injuries to her neck, lower back, right shoulder, right elbow and right knee. (Id. at 313). He noted an antalgic gait pattern.[19] (Id.). He also documented a positive Spurling's sign[20] for the cervical spine and a positive Speed's test[21] for the right shoulder. (Id.). His diagnoses consisted of

---

[18] The last report in the record from Dr. Palmeri is dated June 27, 2006. This report was not a part of the record before ALJ Katz, but was submitted by plaintiff to the Appeals Council. (Tr. 359; Pl. Mem. 7).

[19] "Antalgic" refers to "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's, at 90.

[20] A "positive Spurling's sign" refers to a result from a Spurling's test, which is conducted on patients experiencing neck pain or pain that radiates below the elbow. "The patient's cervical spine is placed in extension and the head [is] rotated toward the affected shoulder. An axial load is then placed on the spine. Reproduction of the patient's shoulder or arm pain indicates possible cervical root compression and warrants further evaluation of the bony and soft tissue structures of the cervical spine." A positive result indicates "cervical root disorder." Available at http://www.aafp.org/afp/20000515/3079.html.

[21] A "Speed's test" is "used to examine the proximal tendon of the long head of the biceps. The patient's elbow is flexed 20 to 30 degrees with the forearm in supination and the arm in about 60 degrees of flexion. The examiner resists forward flexion of the arm while palpating the patient's biceps tendon over the anterior aspect of the shoulder." A positive result indicates biceps tendon instability or tendonitis. Available at http://www.aafp.org/afp/20000515/3079.html.

13

"post-concussive syndrome," "cervical strain with herniated disc and radiculopathy," "right shoulder impingement syndrome with possible rotator cuff tear," "right elbow contusion with olecranon bursitis[22] and lateral epicondylitis,"[23] "lumbosacral strain with possible herniated nucleus pulposis" and "right knee sprain with possible meniscal tear." (Id. at 314).

Dr. Palmeri examined plaintiff four times in September 2003, three times in October 2003, two times in November 2003, two times in December 2003, three times in January 2004 (including performing right shoulder surgery), once a month until September 2004, one time in November 2004, one time in May 2005, one time in June 2005, and one time in June 2006. (Id. at 267-314, 359). Dr. Palmeri's findings remain virtually the same for plaintiff over this span of visits. (Id.).

Dr. Palmeri noted an antalgic gait pattern in plaintiff most months. (Id.). He cited a limited range of motion in her cervical spine in virtually each report, sometimes reporting it as a mild restriction in range of motion. (Id.). He also noted that plaintiff

[22] "Olecranon buristis" refers to "inflammation and enlargement of the bursa over the olecranon; called also *miner's elbow*." Dorland's, at 240.

[23] "Epicondylitis" refers to "inflammation of the epicondyle or of the tissues adjoining the epicondyle of the humerus." Dorland's, at 564.

14

experienced "moderate paralumbar spinal tenderness" in every report. (Id. at 267-314, 359). For example, in a report dated May 6, 2004, Dr. Palmeri reported that plaintiff experienced a mild restriction in range of motion of the lumbar spine. (Id. at 279).

Regarding plaintiff's right shoulder, Dr. Palmeri noted in every report prior to the arthoscopic surgery performed on January 16, 2004 that she experienced either a mild or a moderate restriction in range of motion. (Id. at 290-314). In addition to confirming plaintiff's "partial rotator cuff tear," the surgery also revealed a "tear of [the] superior labrum," a "partial tear of the biceps tendon" and "acromiclavicular arthrosis." (Id. at 287). After the surgery, Dr. Palmeri noted an improving range of motion, but still continuing weakness as compared to her left shoulder. (Id. at 267-89, 359).

As for plaintiff's right knee, Dr. Palmeri noted persistent "tenderness" until approximately August 18, 2004, one year after the accident. (Id. at 267-74). He did not report tenderness in her right elbow after September 2003. (Id. at 306-14).

Beginning in October 2003, Dr. Palmeri noted that plaintiff experienced in her right hip a "persistent tenderness over the area

15

of the greater trochanter."[24] (Id. at 267-303, 359). As late as June 2006, he noted that plaintiff may need to undergo hip surgery.[25] (Id. at 267-303, 359).

In all but three of the reports, Dr. Palmeri recommended that plaintiff "remain out of work."[26] (Id. at 267-314, 359). In every report, Dr. Palmeri noted that plaintiff complained of persistent pain without relief. (Id.). In every report, Dr. Palmeri recommended a follow up visit and some type of physical therapy, pain management and/or medication. (Id.).

Dr. Steven Huish,[27] with Physicians Medical Rehabilitation

---

[24] The "greater trochanter" is "a broad, flat process at the upper end of the lateral surface of the femur, to which several muscles are attached." Dorland's, at 1748.

[25] Dr. Palmeri's June 2006 report was not a part of the record for ALJ Katz. (Tr. 359; Pl. Mem. 7). It was submitted to the Appeals Council. (Id.).

[26] The three reports not explicitly recommending that plaintiff remain out of work are dated January 1, 2004, February 24, 2004 and June 15, 2004. (Tr. 267, 283-84, 290-91). The first two reports respectively precede and follow the surgery and the last report is the most recent report that was included in the record before the ALJ. (Id.).

[27] While there is no indication in the record regarding the level of Dr. Huish's medical training, neither party contends that Dr. Huish is not a medical doctor. Furthermore, though not indicated in the record, Dr. Huish holds a Doctorate of Osteopathic Medicine (D.O.). See http://www.healthgrades.com/ directory_search/physician/profiles/dr-md-reports/Dr-Stephen-Huis h-DO-39760FF3.cfm. Thus, for purposes of the treating-physician rule, Dr. Huish will be considered one of plaintiff's treating

16

Associates, PLLC, treated plaintiff with physical therapy from October 2003 to August 2004 at the request of Dr. Palmeri. (Id. at 190-205, 247-66).[28] Dr. Huish, board-certified for physical Medicine and rehabilitation, made the following diagnostic impressions in his initial consultation of plaintiff on October 6, 2003: "cervical sprain/rule out radiculopathy,"[29] "lumbosacral sprain/strain, rule out radiculopathy," "right knee contusion/sprain, rule out internal derangement," "right shoulder sprain/contusion, rule out internal derangement" and "right elbow post-traumatic lateral epicondylitis." (Id. at 265).

Dr. Huish's later reports note that plaintiff still complained of persistent pain, sleeping difficulties, and restrictions on "virtually all activities of daily living." (Id. at 247-66). His reports also recite that plaintiff experienced a restricted range of motion in her neck and back, a restricted range of motion in her

---

physicians. See 20 C.F.R. § 404.1513(a)(1) (acceptable medical sources includes licensed physicians, which are identified as medical or osteopathic doctors).

[28] There is a report from Dr. Huish dated January 26, 2005 in the record, but it seems that the date is incorrect and should instead be January 26, 2004. (Tr. 247). Dr. Huish's report references plaintiff's surgery and her postoperative condition, clearing her for postoperative therapy. (Id.).

[29] Dr. Huish's reference to the need to rule out radiculopathy is answered by the findings of both Dr. Palmeri and Dr. Holstein, both of whom found that plaintiff suffered from cervical and lumbar radiculopathy. (Tr. 140, 314).

17

right hip due to "tenderness over the greater trochanteric region," an improving range of motion in her right shoulder after surgery but persistent weakness of the rotator cuff and a restricted range of motion in her cervical and lumbar spine. (Id.). He also noted that plaintiff's elbow had improved significantly and that its range of motion was within normal limits as of February 2004. (Id. at 258, 262).

On April 26, 2004, Dr. Huish noted that plaintiff "is unable to work at this point and continues to be temporarily totally disabled." (Id. at 256). On June 7, 2004, Dr. Huish recommended acupuncture, and plaintiff received treatments on two occasions, later declining to continue these treatments. (Id. at 248, 251, 253). On July 29, 2004, Dr. Huish noted that plaintiff "is still having some pain over the AC joint of the right shoulder, especially with lifting, carrying, pushing, pulling, etc." (Id. at 248).

Dr. Huish also recommended physical therapy over the approximately one-year period that he examined and treated plaintiff. He suggested treatments for her right shoulder, right knee, spine, lower back, right hip and neck. (Id. at 247-66).

Dr. Ognian Bouhlev, a pain management specialist at South

18

Shore Medical Center, treated plaintiff from November 2003 to November 2005.[30] (See id. at 354). In November 2003, Dr. Bouhlev noted that plaintiff was suffering from "symptoms of neck pain radiating to [her] shoulder and upper extremities" attributable to "cervical radiculopathy." (See id. at 354). He also noted "symptoms of low back pain radiating to [her] lower extremities[,] due to lumbar radiculopathy." (Id.).

Plaintiff received steroid injections of the cervical spine to deal with "cervical radicular pain" on December 2, 2003 and March 2, 2004. (Id. at 151-52, 186-88). She also received steroid injections of the lumbar spine to deal with "lumbar radicular pain" on December 11, 2003, August 17, 2004, and November 3, 2005.[31] (Id. at 167-68, 206-07, 354). While Dr. Bouhlev reported some improvement in plaintiff's pain after the injections, he noted that it was not enough to keep her symptoms under control. (Id. at 322,

---

[30] There is some issue as to whether an updated report from Dr. Bouhlev dated March 9, 2006 and referencing treatment received by plaintiff in November 2005 was made a part of the record for ALJ Katz. Plaintiff's counsel states that he received and submitted this updated report to ALJ Katz on March 9, 2006, more than three months before the ALJ issued his decision. (Pl.'s Mem. at 6-7). Plaintiff argues that there is no indication from ALJ Katz's opinion that he considered this updated report. (Id.).

[31] Plaintiff's memorandum of law mentions an injection of the lumbar spine on February 6, 2005. While Dr. Bouhlev's most recent report says plaintiff received a series of lumbar spine injections, the record does not contain a confirmation of the February 2005 date. (Tr. 141-73, 183-89, 319-27, 354).

327).

In May and June 2004, plaintiff also received a "right-sided greater trochanteric bursa steroid injection" to treat "severe non-radiating pain overlying [the] right lateral side of [her] upper thigh," "multiple trigger point injections" to treat severe muscle spasm and pain involving neck and shoulder gridle" and a "right-sided occipital nerve block" to treat intractable headaches. (Id. at 324-26). Dr. Bouhlev also stated that "[regarding plaintiff's condition,] straight leg raise is positive on [her] right lower extremity and [has been] aggravated by dorsiflexion[32] of the right foot." (Id. at 322).

Dr. Bouhlev described plaintiff's treatment in his updated report dated March 9, 2006 as consisting of "pain medications, physical therapy . . . and minimally invasive procedures in the form of blocks and epidural steroid injections in addition to trigger points [injections]." (Id. at 354). He also noted that plaintiff suffered "with antalgic gait" and had "profound muscle spasm in neck and lower back." (Id.). Dr. Bouhlev's reports also document plaintiff's complaints of persistent pain and recite that

---

[32] "Dorsiflexion" refers to "flexion or bending toward the extensor aspect of a limb, as of the hand or foot." Dorland's, at 503.

20

as recently as November 3, 2005, he had administered a lumbar epidural steroid injection. (Id. at 141-73, 183-89, 319-27, 354).

## 2. Non-Physician Treating Sources

Vito Guarino, a chiropractor, saw plaintiff five times during September 2003. (Id. at 130). He reported that he could not comment on plaintiff's disability status based upon the number of times he had examined her, presumably as they were too few. (See id.).

## 3. Examining Consulting Physicians

The record also contains a number of reports by consulting doctors retained by the SSA.[33] We summarize their results below.

---

[33] The SSA will request that a claimant undergo a consultative examination when "[claimant's] medical sources cannot or will not give [the SSA] sufficient medical evidence about [claimant's] impairment for [the SSA] to determine whether [claimant] is disabled." 20 C.F.R. § 404.1517. The SSA pays for this examination. Id. Results from a consultative examination are used by the SSA to "try to resolve a conflict or ambiguity if one exists ... [it is also used] to secure needed medical evidence the file does not contain such as clinical findings, laboratory tests, a diagnosis or prognosis necessary for [a] decision." 20 C.F.R. § 404.1519a. The SSA describes the consultants as "such physicians and psychologists who work for [the SSA] directly but are also those who do review and adjudication work in the State agencies. Physicians and psychologists who work for [the SSA] directly as employees or under contract will not work concurrently for a State agency." 20 C.F.R. § 404.1519q.

a.     Orthopedic Surgeon

Dr. John King, an orthopedic surgeon, performed a consultative examination of plaintiff for SSA on September 29, 2004. (Id. at 215). According to Dr. King, she reported experiencing pain in her right hip, her low back, her cervical spine and her right shoulder after being involved in a motor vehicle accident. (Id.). Plaintiff also reported that she had undergone surgery for her right shoulder, had been receiving post-operative treatment for her right shoulder, had been to pain management, had been prescribed medications and had received physical therapy. (Id.).

At the consultation, plaintiff complained of constant pain increased by walking, low back pain, frequent numbness and tingling in her right lower extremity. (Id. at 216). She reported having difficulty sleeping and said that she could no longer drive or take walks. (Id.). She also reported taking Vicodin, Celebrex, Ambien, amitriptyline and tizanidine for increased pain.[34] (Id.).

Dr. King's examination of plaintiff revealed "[s]traight leg raising supine 60 degrees." He mentioned that her "right side cause[d] low back pain . . . [while her] left side cause[d] no

---

[34] Dr. King did not list the respective dosages of medication that plaintiff stated she took to manage her pain. (Tr. 216).

22

pain." (Id.). He also noted that plaintiff had better sensation to a pinprick on her left lower extremity than on her right. (Id.). Her left upper extremity also experienced better generalized sensation than her right upper extremity. (Id.). Dr. King stated that her gait pattern was normal and that she was able to toe and heel walk. (Id.). He reported that "patient's forward flexion of the lumbar spine was 50 degrees, extension was 10, right and left bend 25 degrees" and that "patient's forward flexion of the cervical spine was 2 fingerbreadths to the wall, extension was full, right and left turn 35 degrees." (Id.).

Though Dr. King found that plaintiff did not experience a restriction in the range of motion of her hips, he found that her right hip did cause her pain in the area of the greater trochanter. (Id.). He also found that plaintiff's left shoulder had "180 degrees of forward flexion [and] 180 degrees of abduction," while her right shoulder had "130 of forward flexion [had] 130 of abduction." (Id. at 217).

Dr. King's diagnostic impression, more than one year after the accident, consisted of "sprain cervical spine, sprain lumbar spine, bursitis of the right hip and tendinitis and bursitis right shoulder, rule out impingement." (Id.). Dr. King opined that plaintiff should avoid working at or above shoulder level on the

23

right side and not engage in repetitive bending and stooping. (Id.). He further opined that plaintiff should avoid standing or walking for more than four hours in an eight-hour period. (Id.).

### b.   Neurologist

Dr. Joseph Schneider, a neurologist, performed a consultative examination of plaintiff for SSA on October 11, 2004. (Id. at 218). According to Dr. Schneider, from a neurological point of view plaintiff had been experiencing "paresthesia[35] in the right hand" and headaches since the motor vehicle accident. He reported that in that accident, plaintiff "first fell to the left and afterwards to the right, striking her right shoulder and right thigh on the right side of the car." (Id.). At the examination, plaintiff noted that in the wake of the accident, she had complained of pain in the right shoulder, of numbness in the right fingers and of cervical and lumbar pain radiating to the lower extremity. (Id.). Dr. Schneider also noted that plaintiff was undergoing physical therapy, attending pain-management sessions, and had received steroid injections to the cervical and lumbar regions with "good response." (Id. at 219).

---

[35] "Parasthesia" refers to "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." Dorland's, at 1234.

24

According to Dr. Schneider, at the time of the consultation, plaintiff complained of a "nagging" cervical pain that radiated to her right shoulder, intermittent lumbar pain that often radiated to her right lower extremity as far distal as her toes, and intermittent headaches, which occurred once or twice a week. (Id.).

Dr. Schneider described plaintiff as a 41-year-old woman who is "well developed" and "well nourished," and "who seemed to be in good physical health." (Id. at 219-20). Though she complained of numbness in her right fingers, Dr. Schneider observed that plaintiff "did not seem to be in discomfort." (Id. at 220). He reported that plaintiff's "gait was characterized by a somewhat decreased range but not [the] frequency of the associated movements on the right [though there is] pain in the shoulder joint." (Id.). He also reported that plaintiff's alternating hand movements were normal, and he detected no motor instability. (Id.). Dr. Schneider did note decreased sensation to touch in the right thumb, right ring and little fingers, but also noted minimal impairment in the index and middle fingers. (Id.). He found her speech and language skills to be normal. (Id. at 221).

Dr. Schneider did not detect paravertebral muscle spasm in plaintiff's cervical and lumbar spine, and found no evidence of tenderness. (Id.). He also found that plaintiff registered no pain

25

in sciatic distribution on straight-leg raising. (Id.).

Dr. Schneider's diagnostic impression consisted of a neurological examination that was normal except for "a mild sensory impairment (decreased sensation to touch) in the distribution of the distal aspect of the radial, ulnar, and to a lesser extent in the median nerve, on the right, affecting only the sensory function." (Id.). He did not find evidence of cervical radiculopathy, lumbar radiculopathy or carpal tunnel syndrome. (Id.). He also did not find that plaintiff's headaches needed any treatment other than over-the-counter analgesics on an as-needed basis. (Id.). He opined that his findings were consistent with a "mild and resolving neuropathy" that would be resolved in three to six months. (Id. at 221-22).

### 4.   Non-Physician "Reviewer"

Elizabeth Turner, a non-physician serving as a state agency "reviewer," completed a Physical Residual Functional Capacity ("RFC") Assessment of plaintiff on November 23, 2004, apparently based solely on her review of plaintiff's SSA file.[36] (Id. at 223-

---

[36] Residual functional capacity is a claimant's maximum remaining ability, despite her limitations, to do sustained work activities in an ordinary work setting on a regular and continuing basis. The RFC assessment must include a discussion of the individual's abilities on that basis. Schultz v. Astrue, 2008

26

28). Ms. Turner, whose medical expertise -- if any -- is entirely undocumented on the current record, listed plaintiff's exertional limitations as being lifting and/or carrying on occasion up to twenty pounds, lifting and/or carrying frequently up to ten pounds, standing and/or walking with normal breaks up to six hours in an eight-hour workday and sitting with normal breaks up to six hours in an eight-hour workday. (Id. at 224). She opined that plaintiff's postural limitations allowed her to engage "occasionally" in climbing up ramps and stairs, balancing, stopping, kneeling, crouching and crawling. (Id. at 225). She further opined that plaintiff did not have visual, communicative or environmental limitations. (Id. at 225-26). According to Ms. Turner, plaintiff's only manipulative limitation was reaching in all directions, including overhead. (Id.).

Ms. Turner listed the primary diagnosis of plaintiff as "right shoulder rotator cuff," the secondary diagnosis was "cervical and lumbar sprain", and other alleged impairments included hip bursitis and headaches. (Id. at 223). In Ms. Turner's explanation of her

WL 728925, at *6 (N.D.N.Y. Mar. 18, 2008) (quoting Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999)). If a claimant has more than one impairment, all medically determinable impairments must be considered, including those that are not "severe." The assessment must be based on all relevant medical and non-medical evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. §§ 404.1545(a)(1)-(3).

27

finding of plaintiff's residual functional capacity, she recited that plaintiff's gait pattern was normal, her heel and toe were intact, her muscle tone and strength were normal, her coordination was normal, and her headaches were mostly resolved. (Id. at 224). Ms. Turner did note, however, that plaintiff experienced a mild decrease to touch in her right hand, C4-C5 and C5-C6 disc protrusions and decreased range of motion in her right shoulder, resulting from tendinosis without tear. (Id.).

Ms. Turner also concluded that though plaintiff's complaints of pain were previously credible, those complaints were no longer credible in view of improvement documented by exam results. (Id. at 226-27). In apparent support of her observation, she noted that plaintiff drives, walks, rides, shops with help, watches television and listens to music. (Id.).

Ms. Turner declined to give Dr. Huish's statement that plaintiff was "temporarily totally disabled" dispositive weight because she stated that the opinion was old, not explained well, and unsupported by a more recent opinion by either Dr. Huish himself or another physician regarding plaintiff's medical condition. (Id. at 227). Instead, Ms. Turner parroted the finding of Dr. King that plaintiff could work, with certain limitations. (Id.). Those limitations included avoiding repetitive stooping and

28

bending, as well as avoiding standing and walking more than four
hours in an eight-hour workday (Id.).

B.   Mental Conditions

1.   Treating Physicians

There is nothing in the record indicating that plaintiff has
been examined by a treating physician or a treating non-physician
regarding psychological impairments. (Id. at 210).

2.   Examining Consulting Psychologist

Dr. Leslie Helprin, a psychologist at Industrial Medicine
Associates, P.C., completed a psychiatric evaluation of plaintiff
for the SSA on September 21, 2004. (Id.). Dr. Helprin described
plaintiff as being 41 years old, married and living with her
husband. (Id.). Dr. Helprin noted that plaintiff was driven to the
consultative examination that day by her mother-in-law. (Id.). She
also noted that plaintiff had a high school degree, but not a
college degree, notwithstanding her completion of three years of
college. (Id.). Plaintiff reported to Dr. Helprin that she had not
been able to work since being involved in a motor vehicle accident
on August 15, 2003 because she "cannot stand or sit long, bend, or

29

hold her pen long." (<u>Id.</u>). Plaintiff's job history consisted of secretarial and computer work as well as working as a fast food manager. (<u>Id.</u>). Plaintiff reported no history of drug or alcohol use. (<u>Id.</u> at 211).

According to Dr. Helprin, plaintiff stated that she had not received any past treatment for a psychiatric condition. (<u>Id.</u> at 210). Plaintiff further stated that she was not receiving any current treatment for a psychiatric condition. (<u>Id.</u>).

Dr. Helprin noted that plaintiff had not been hospitalized for physical injuries following the motor vehicle accident, but that she reported that she was undergoing physical therapy three times a week and taking Vicodin, Celebrex, amitriptyline, Baclofen and Ambien.[37] (<u>Id.</u>). Plaintiff also complained of having difficulty sleeping and of waking up through the night "about 10 times due to pain." (<u>Id.</u>). She reported loss of appetite since approximately January 2004, weight loss of about ten to fifteen pounds, occasional crying spells when she is not able to do what she wants to do, and sometimes a desire not to get out of bed. (<u>Id.</u>).

---

[37] Dr. Helprin noted that plaintiff takes the listed medications in the following dosages: Vicodin, b.i.d. (or twice a day); Celebrex, 2 or 3 tabs b.i.d. to t.i.d. (or two to three times a day); amitriptyline, 1 to 2 tabs o.d. (or once daily); baclofen, 1 to 2 tabs o.d.; and Ambien, h.s. (at bedtime). (Tr. 210).

30

Plaintiff denied, however, any suicidal thoughts or suicide attempts. (Id.). She also denied suffering from anxiety, mania, and thought disorder. (Id.). Plaintiff did report concentration difficulties. (Id.).

Dr. Helprin concluded that plaintiff's manner of relating, social skills and overall presentation were adequate. (Id. at 211). There was no evidence of hallucinations, delusions or paranoia in her thought processes. (Id.). However, Dr. Helprin did note that plaintiff's attention, concentration, and recent and remote-memory skills were "mildly impaired." (Id.). Thus, she concluded that plaintiff had cognitive functioning with intellectual skills in the below-average range. (Id. at 212).

Dr. Helprin noted that plaintiff is able to "dress, bathe and groom herself." (Id.). She also noted that plaintiff's husband cooked, helped with the shopping and did laundry due to plaintiff's difficulties with holding heavy items. (See id.). Plaintiff reported that she had hired a cleaning person to maintain the house. (Id.).

Plaintiff stated to Dr. Helprin that she could manage her own money and drive locally, but did not take public transportation because she had no need. (Id.). Plaintiff also reported socializing

31

with friends and having "good" family relationships. (Id.).

Prior to the motor vehicle accident, plaintiff was active, engaging in such activities as bowling, softball, swimming, going out to dinner and attending card parties. (Id.). At the time of the consultation, plaintiff reported spending her days since the motor vehicle accident doing limited chores, watching television, listening to music and visiting the doctor approximately four times a week. (Id.).

Dr. Helprin concluded that plaintiff was "able to follow and understand simple directions and instructions, perform simple rote tasks and others, and deal appropriately with her stress." (Id.). She further concluded that "examination results are inconsistent with allegations", but did not identify the "allegations" to which she referred. (See id.). She diagnosed plaintiff along Axis 1 as suffering from an "adjustment disorder with depressed mood, moderate episodic," noted on Axis 2 to "rule out borderline intellectual functioning", and on Axis 3 noted that plaintiff suffered from "bulging disks [and] body pains." (Id. at 212-13).[38]

---

[38] The examiner classified plaintiff's mental illness according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), published by the American Psychiatric Association. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed. rev. 2000). The DSM assess give dimensions as described below: Axis I refers to clinical disorders and other conditions that may

32

Dr. Helprin recommended that plaintiff seek individual psychological therapy for pain management purposes and that she continue medical follow-ups to determine whether her medical conditions precluded her from working. (Id.).

### 3. Non-Examining Psychological Consultant

Michelle Marks, Ph.D., a state agency psychological consultant, evaluated the record and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique of plaintiff for the SSA on November 24, 2004. (Id. at 229-46).

In the Mental Residual Functional Capacity Assessment, Dr. Marks found plaintiff to be "not significantly limited" in all but two categories out of the twenty listed on the form. (Id. at 229-31). The twenty categories listed abilities within the following four functional areas: "understanding and memory," "sustained concentration and persistence," "social interaction" and "adaptation." (Id.). Dr. Marks listed plaintiff as "moderately

---

be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V refers to the global assessment of functioning ("GAF") score. Id. The GAF scale goes from 0 to 100 and may be used to report the clinician's judgment of the individual's overall level of functioning, with 100 the best functioning and 1 to 10 reflecting the danger of hurting one's self. Id. at 32.

limited" in both "the ability to maintain attention and concentration for extended periods" and "the ability to respond appropriately to changes in the work setting." (Id. at 229-30).

Dr. Marks concluded that plaintiff suffered from "adjustment disorder with depression, moderate, episodic, and [rule out] borderline IQ." (Id. at 231). Plaintiff's Mental Status Examination ("MSE") was positive for dysphoric affect, dysthymic mood[39], and mildly impaired attention, concentration, and recent and remote memory. (Id.). Dr. Marks did find, however, that plaintiff was able to understand and follow directions, sustain a reasonable pace, relate and respond in a socially appropriate manner, make decisions and adapt to changes in routine. (Id.).

Dr. Marks listed plaintiff's condition on the completed Psychiatric Review Technique as "adjustment disorder." (Id. at 236). Again, she noted that plaintiff suffered "moderate" functional limitations in regard to "difficulties in maintaining concentration, persistence, or pace." (Id. at 243).

---

[39] "Dysthemia" is a mood disorder characterized by depressed feeling and loss of interest of pleasure in one's usual activities, the symptoms of which persisted for more than two years, but are not serious enough to meet the criteria for major depression. Dorland's, at 519.

34

III. The Hearing Before the ALJ

A. Plaintiff's Testimony

Plaintiff testified that she had not worked since her motor vehicle accident in August 2003, when she was serving as an office manager at Glass Company. (Id. at 334-35). She described the accident as occurring at an intersection, where another car ran a red light and "just wiped us out." (Id. at 335).

Plaintiff testified that she earned a yearly salary of approximately $32,000-$33,000 at the Glass Company and that her job was held open for a short period after the motor vehicle accident but could no longer be held after a certain point. (Id. at 338).

Describing her physical ailments, plaintiff testified that she had to undergo rotator-cuff surgery on the right shoulder and described herself as suffering from nerve, cervical and lumbar damage on the right side. (Id. at 335-36). She testified that it was difficult for her to get around, that she could not perform the same daily activities as before the accident and that she could no longer play or coach sports. (Id.).

Plaintiff explained that she and her husband did not drive

35

far, and that she had to get out of the car and stretch every half-
hour. (Id.). She also explained that her husband did most of the
driving. (Id.). The ALJ elicited from plaintiff the fact that she
traveled approximately fifty minutes to her medical appointments in
New Rochelle. (Id. at 348). However, he did not ask whether she
needed to stop and stretch during the trip. (See id.). She also
testified that she could sit no more than ten to fifteen minutes in
her car after getting out to stretch because the pain "feels like
a knife" in her neck. (Id.).

Plaintiff also testified that she was having a problem sitting
at the hearing because of numbness in her neck, her right leg and
her right thigh. (Id.). Regarding the numbness in her leg, plaintif
said: "you can't feel it and you can't, you can't use it. Like I
can't cross my legs, I can't do anything like that." (Id. at 337).
Because of her physical ailments and resulting pain, plaintiff
stated that she could not walk far; after a block, she would need
to stop. (Id.).

Plaintiff testified that she took Vicodin for pain about two
to three times a day depending on the severity of the pain. (Id. at
338). She also testified that she had received epidural injections
to her neck and back, as well as other injections in other parts of
her body. (Id.). Plaintiff also testified that since the accident

36

she had been treated by Dr. Palmeri for her shoulder and back and by Dr. Bouhlev for pain management. (Id. at 339).

Plaintiff testified that the medication prescribed by her physicians helped "a little," but that any relief was only "temporary." (Id. at 339-40). She stated that the medication just allows her to "function." (Id.). The ALJ asked plaintiff where her pain would fall on a scale of one to ten when the medication would wear off, and plaintiff responded that her pain was approximately a seven or an eight. (Id. at 340). The ALJ then asked where her pain would fall on that scale while under the effect of medication, and plaintiff responded that her pain was approximately a five. (Id.). She indicated that activities that involved her moving a lot, such as driving, could push her pain up to a ten. (Id.).

Plaintiff described the pain in her back as radiating toward the right side and down her right leg. (Id. at 340-41). She testified that sometimes the pain is so severe that it feels as if she is "paralyzed." (Id. at 341). She stated that she felt "paralyzed" on one or two occasions. (Id.). Plaintiff indicated that the medication would sometimes makes her feel incoherent. (Id. at 342). Plaintiff also reported difficulties concentrating. (Id.).

Plaintiff testified that she goes to the market, but that she

37

cannot lift or carry anything because it causes pain in her right arm, and someone has to assist her. (Id. at 341). She also stated that she had switched from glass pots, pans and dishes to plastic ones in order to avoid dropping them because she had difficulty gripping items with her right hand. (Id.). Plaintiff also testified that she could not hold a pen and write steadily for more than ten to fifteen minutes because her arm would go numb. (Id. at 341).

Plaintiff testified that she took Ambien to help her sleep, but that she would nonetheless wake up in the middle of the night several times due to pain. (Id. at 342). She stated that her daily routine included principally watching television and walking back and forth. (Id. at 343). She reported that she could not do the things she used to do prior to the accident, such as socializing and even talking on the phone. (Id.). She testified that because of difficulty with her arm and hand, she does not wear pullover sweaters or shoes that have to be tied and even has to have someone else wash her hair for her. (Id. at 344).

Plaintiff testified that her physicians said that she would improve after surgery, but that she did not feel better. (Id. at 345-46). Plaintiff also testified that she moved from an apartment to a condominium in part because of difficulty with steps. (Id. at 346-47).

38

B.   Conclusion of the Hearing

During the hearing, the ALJ noted that plaintiff's pain-management physician, Dr. Bouhlev, had provided a series of complete reports, but that none had been received since 2004, with the later treatment records being confined to handwritten notes. (See id. at 347). Plaintiff's counsel responded that he had been attempting to obtain a more comprehendible summary of later treatment by Dr. Bouhlev, for which the ALJ left the record open until January 2006. (Id. 347, 349). As reflected in the record, Dr. Bouhlev prepared and transmitted a detailed report to plaintiff's attorney on March 9, 2006, in which he confirmed his continued treatment of plaintiff (Tr. 354-55), and the attorney sent it to the ALJ the same day. (Pl.'s Mem. at 6-7).

C.   The ALJ's Decision

ALJ Katz issued his decision on June 15, 2006. (Tr. 18). He applied the five-step evaluation process required under 20 C.F.R. § 404.1520 in evaluating plaintiff's disability claim, and found her not disabled. (Id. at 12-13).

39

1.  Overview of the ALJ's Application of the Five-Step Evaluation Process Required Under 20 C.F.R. § 404.1520

At the first step, the ALJ found that plaintiff met the disability insured status requirements of the SSA's Title II on her onset date of August 15, 2003, and continued to meet them. (Id. at 13). Further, he found that plaintiff had not engaged in any substantial gainful activity since being involved in the motor vehicle accident on August 15, 2003. (Id.).

At the second step, he found that plaintiff was suffering from cervical and lumbar strain with radiculopathy, as well as an adjustment disorder with depressed mood. (Id.). Of these conditions, and as defined by C.F.R. § 404.1520(c), he concluded that the back impairment was "severe" while the depression was not. (Id.).

At the third step, the ALJ concluded that neither plaintiff's back impairment nor her depression met the criteria for impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.[40] (Id.).

_____

[40] If a claimant has a "listed" impairment, she will be considered disabled per se without an additional assessment of vocational factors such as age, education, and work experience. If the plaintiff does not have a listed impairment, the Commissioner must consider whether the plaintiff still has the capacity to perform work. See, e.g., Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

40

Accordingly, he found that plaintiff was not per se disabled.
(Id.).

At the fourth step, the ALJ began by considering plaintiff's
RFC to perform her past relevant work. (Id. at 13-17). The ALJ
found that plaintiff's testimony about the severity of her symptoms
and the degree of her functional limitations did not appear to be
consistent with the medical evidence in the record. (Id. at 16). He
concluded, rather, that plaintiff's RFC allowed her to perform
sedentary work, as defined in SSA regulations,[41] but with certain
physical limitations. (Id. at 16-17).

The ALJ stated that plaintiff could sit for a total of eight
hours and stand or walk for a total of four hours in an eight-hour
workday on a sustained basis in a work environment. (Id. at 16). In
addition, he found that she was able to lift or carry objects
weighing a total of ten pounds. (Id.). According to the ALJ,
plaintiff's limitations in performing sedentary work include
working at or above shoulder level on the right side more than
seventy percent of the time during a typical workday and performing

---

[41] Sedentary work involves lifting no more than ten pounds
and occasionally lifting or carrying articles like docket files,
ledgers, and small tools. Although a sedentary job is one that
involves sitting, a certain amount of walking and standing is
often necessary in carrying out job duties. 20 C.F.R. §§
404.1567(a), 416.967(a)

41

repetitive bending or stooping more than fifty percent of the time during a typical workday. (Id.).

The ALJ found that plaintiff's past relevant work consisted of secretarial duties that involved a light level of exertion, and that since she was restricted to sedentary work, she was unable to perform her past relevant duties.[42] (Id. at 17) (citing 20 C.F.R. § 404.1565)).

At the fifth step, the ALJ determined that plaintiff was a "younger individual," age 40 on her onset date, that she had a high school education and that she is sufficiently literate and able to communicate in the English language.[43] (Id. at 17-18); See 20 C.F.R. §§ 404.1563 and 404.1564. He further found that although plaintiff's exertional limits did not allow her to perform her past relevant work, a significant number of jobs existed in the national and local economies that she could perform. (Id.). Accordingly, he

---

[42] ALJ Katz did not give any further explanation for this determination. (See id. at 17). Presumably he was referring to the limitations he listed in his finding that plaintiff has the RFC to perform sedentary exertion level work taking into account those limitations articulated by Dr. King. (Id. at 16-17). In short, plaintiff's duties from her past relevant work would involve her working at or above shoulder level, engaging in repetitive bending or stooping, and standing for more than four hours in an eight-hour workday.

[43] He further found that transferability of skills was not an issue in this case under 20 C.F.R. § 404.1568. (Tr. 17).

42

concluded that she had not been under a disability at any time from the August 2003 accident through June 15, 2006, the date of his decision. (Id. at 18).

### D. The Appeals Council Decision

Plaintiff sought review by the Appeals Council. (Tr. 7). The Appeals Council denied plaintiff's request for review without discussion of the merits, inviting her to file a civil action if she disagreed with the denial. (Id. at 5-5A). Plaintiff subsequently filed the present action.

### IV. The Parties' Motions

#### A. Plaintiff's Motion for Judgment on the Pleadings

In plaintiff's initial brief, she presses four major points. (Pl.'s Mem. 7). First, she contends that the ALJ failed to consider a 2006 report from Dr. Bouhlev that he had specifically requested at the hearing. (Id. at 6-7). That report listed multiple positive findings of severe impairments and referenced a November 3, 2005 epidural steroid injection to her lumbar spine. (Id. at 8). Plaintiff notes that this report is consistent with plaintiff's complaints of extreme pain and other reports of her treating

43

physicians, and contradicts a finding by the ALJ that there was no evidence in the record demonstrating that plaintiff received treatment from Dr. Bouhlev after June 2005. (Id.; see also Tr. 8).

Second, plaintiff asserts that she testified that she suffered from difficulties with such activities as cooking, dressing and washing her hair, and that this testimony refutes the ALJ's statement that the record shows no deficits in her ability to perform the activities of daily living. (Id.).

Third, plaintiff contends that the ALJ did not properly apply the treating-physician rule because he did not provide an explanation for rejecting the opinions and findings of plaintiff's treating physicians and, instead, favoring a one-time evaluation by Dr. King. (Id. at 9). Specifically, plaintiff points to Dr. Palmeri's repeated statements that plaintiff should remain out of work, which the ALJ did not mention in his opinion. (Id.). Plaintiff also notes that her treating physicians' reports spoke to her extreme pain on a consistent basis, thus refuting the ALJ's contention that she did not relate severe pain to her treating physicians. (Id. at 9).

Lastly, plaintiff contends that the ALJ's findings as to her RFC are unsupported. (Id. at 10). She notes that the record is

44

silent regarding whether she has the ability to sit for extended periods of time and that the ALJ inferred from that absence of medical evidence that she could sit for up to eight hours. (Id.). However, she argues that because there must be positive evidence to support an RFC, the ALJ's determination that a silence in regard to her ability to sit supported the finding that she could perform sedentary work was improper. (Id.). Plaintiff also points to her pain as a non-exertional limitation, arguing that it adversely impacts her ability to do any work and diminishes her capacity to perform the threshold activities specified for sedentary work. Therefore, the ALJ was required to evaluate her abilities on an individual basis rather than rely on "the Grids".[44] (Id.).

## B. Defendant's Motion for Judgment on the Pleadings

The Commissioner responds by contending that his determination of non-disability is supported by substantial evidence. (Def.'s

---

[44] The Grids take into account the claimant's residual functional capacity in conjunction with her age, education and work experience. Based on these factors, the SSA uses the Grids to evaluate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). The Grids classify work into different categories based on the exertional requirements of the different jobs. Specifically, the Grids describe work as sedentary, light, medium, heavy or very heavy, based on the job requirements for primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling. Id. at 667 n.2.

45

Mem. 1). The Commissioner argues five major points.

First, he contends that the record, including records of plaintiff's treating physicians, supports the conclusion that plaintiff is restricted only with respect to working at or above shoulder level and repetitively bending and stooping. (Def.'s Mem. 17-19). The Commissioner points to Dr. Schneider, who concluded that plaintiff was normal in every respect except for a mildly decreased sensation to touch on her right side that would resolve within three to six months. (Id. at 17-18). The Commissioner also points to reports of Dr. Palmeri and Dr. Huish, arguing that their notations that plaintiff's right shoulder improved after undergoing arthoscopic surgery in January 2004 support the ALJ's conclusion. (Id.). He finally cites Dr. King's report that plaintiff had only a mild restriction in range of motion in the end ranges of the cervical spine and that she could heel and toe walk without significant difficulty despite a moderate paralumbar spinal tenderness. (Id.).

Second, the Commissioner contends that the ALJ is not required to accord any weight to conclusory statements about a plaintiff's disability status made by treating physicians, and therefore the ALJ properly refused to give controlling weight to Dr. Palmeri's recommendation that plaintiff remain out of work. (Id. at 19-20).

46

He further argues that Dr. Palmeri's findings that plaintiff showed improvement contradicted his recommendation that she remain out of work and supported the opinions of the consulting physicians. (Id.); see also 20 C.F.R. §§ 404.1512(b)(6), 404.1527(e)(2) & (f)(2), 416.912(b)(6), 416.927(e)(2) & (f)(2).

Third, the Commissioner contends that it is within the ALJ's discretion to evaluate the credibility of plaintiff's statements regarding subjective pain, and that the ALJ properly determined in this case that plaintiff's testimony was not credible. (Id. at 20-22). Specifically, he insists that plaintiff's complaints were not supported by the medical evidence in the record, which demonstrated improvement after her surgery, her physical therapy and the epidural injections. (Id.). He further argues that the medical evidence contradicts certain statements made by plaintiff regarding her disabling symptoms, and states that while plaintiff testified to having extreme pain, she never reported such disabling symptoms to her physicians. Specifically, with regard to her ability to sit, the Commissioner suggests that there is no indication in the record that she has difficulty with sitting and that plaintiff herself testified that she can sit in a car for approximately an hour while driving to her medical appointments. (Id.).

Fourth, the Commissioner contends that the ALJ properly

47

decided that there were a significant number of jobs in the national economy that the plaintiff could perform. (Id. at 22). He asserts that based on plaintiff's vocational factors, including age and education and an RFC for sedentary work, the medical-vocational guidelines direct a finding that she is not disabled. (Id.). He argues that plaintiff's limitations in reaching, unlike limitations in manual dexterity, do not narrow the sedentary range of work that an individual can perform, and therefore she could perform the full range of sedentary jobs. (Id. (citing SSR 85-15, 1985 WL 56857, at *7 (1985); SSR 96-9p, 1996 WL 374185, at *6, 8 (1995)). Defendant also argues that the ALJ properly determined that plaintiff's subjective symptoms of pain did not cause limitations or restrictions, either exertional or non-exertional. (Id. at 23).

Lastly, the Commissioner contends that there is no indication that the ALJ received the updated narrative from Dr. Bouhlev, which plaintiff asserts was submitted on March 9, 2006, before the ALJ issued his decision. (Id. at 23-24). He argues that the record shows that plaintiff submitted the updated report, along with one from Dr. Palmeri, to the Appeals Council after receiving an unfavorable determination. (Id.). Further, he asserts that he was not required to accord any weight to the updated report, nor to an updated report submitted by Dr. Palmeri to the Appeals Council, as Dr. Bouhlev's report did not render the ALJ's decision contrary to

48

the weight of the evidence and Dr. Palmeri's report regarded a
period of time following the ALJ's decision, and was therefore
irrelevant to his consideration. (Id.).

## C. Plaintiff's Reply

In reply, plaintiff first argues that the Commissioner refers
only to the substantiality of the record evidence and has thus
ignored the requirement that the agency demonstrate that the record
reflects no error of law. (Pl. Reply Mem. of Law ("Pl. Reply Mem.")
1). Plaintiff reiterates contentions made in her first brief that
the ALJ committed a number of legal errors. (Id.; see Def.'s Mem
14-16). These legal errors include (1) the failure of the ALJ to
address or consider in his decision an updated report from Dr.
Bouhlev, which he received months before issuing his decision on
June 15, 2006 (id. at 2), (2) the failure to accord weight to Dr.
Palmeri's opinion or explain why he rejected his opinion (id.), (3)
the failure to address plaintiff's complaints of pain (id. at 3),
and (4) the failure to complete a "function by function analysis"
to support his determination of plaintiff's RFC, and develop
evidentiary support for his finding that plaintiff had the capacity
to complete sedentary work. (Id.). In regard to the last point,
plaintiff argues that the ALJ, when determining an RFC, must
support his determination with acceptable medical evidence and that

49

his finding that she could sit for long periods is unsupported by
the record, which is silent on the matter. (Id.).

## ANALYSIS

### I.   Standard for Benefits Eligibility

For purposes of eligibility for benefits, an applicant is
"disabled" within the meaning of the Act, if she is unable "'to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which lasted or can be expected to
last for a continuous period of not less than 12 months.'"[45] Carroll
v. Sec. of Health and Human Servs., 705 F.2d 638, 641-42 (2d Cir.
1983) (quoting 42 U.S.C. § 423(d)(1)(A)). The Act requires that the
impairment be "'of such severity that [plaintiff] is not only
unable to do [her] previous work but cannot, considering [her] age,
education and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.'"
Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting 42

---

[45] Substantial gainful activity is defined as work that: "(a)
[i]nvolves doing significant and productive physical or mental
duties; and (b) [i]s done (or intended) for pay or profit." 20
C.F.R. §§ 404.1505, 404.1510; see e.g., Craven v. Apfel, 58 F.
Supp. 2d 172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F.
Supp. 418, 424 (S.D.N.Y. 1996).

50

U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial, for purposes of the Act, that an opening for such work may not be found in the immediate area where she lives or that a specific job vacancy may not exist. 42 U.S.C. § 423(d)(2)(A). Lastly, in assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

The SSA regulations set forth a five-step sequential process to evaluate disability claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The Second Circuit has described this sequential process as follows:

"First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider [her] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the

51

*fourth* inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. *Finally,* if the claimant is unable to perform [her] past work, the Secretary then determines whether there is other work which the claimant could perform."

Bush, 94 F.3d at 44-45 (emphasis in original) (quoting Rivera v. Schwiker, 717 F.2d 719, 722-23 (2d Cir. 1983)).

Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth step, that is, demonstrating the existence of jobs in the economy that plaintiff can perform. See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). Normally, in meeting his burden on this fifth step, the Commissioner may rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grids."[46] Zorilla, 915 F. Supp. at 667. However, if plaintiff suffers from non-exertional limitations,[47] exclusive

---

[46] See note 44, p. 45, supra.

[47] An exertional limitation is a limitation of restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e., sitting, standing, walking, lifting, carrying, pushing, and pulling). Rosa v. Callahan, 168 F.3d 72, 78, n.2 (2d Cir. 1999) (citing Zorilla, 915 F. Supp. at 667 n.3). "Limitations or restrictions which affect [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered non-exertional." Samuels v. Barnhart, 2003 WL 21108321, at *11 n.14 (S.D.N.Y. May 14, 2003); see also 20 C.F.R. §§ 404.1569a(c)(1)(i)(vi).

reliance on the Grids is inappropriate. See Butts, 388 F.3d at 383 (citing Rosa, 168 F.3d at 78).

## II. Standard of Review

When a claimant challenges the SSA's denial of disability insurance benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)); see 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to inferences to be drawn from the facts. See, e.g., Carbello ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether the record contains substantial evidence to

53

support a denial of benefits, the reviewing court must consider the whole record, weighing the evidence on both sides of the question. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Williams, 859 F.2d at 258.

It is the function of the Commissioner, not the courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Carroll, 705 F.2d 642. While the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124, (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d. Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Even if the record, as it stands, contains substantial evidence of disability, the SSA decision may not withstand a challenge if the ALJ committed legal error.

Balsamo, 142 F.3d at 79.

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; cf. Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). "'It is self-evident that a determination by the [ALJ] must contain a sufficient explanation of [his] reasoning to permit the reviewing court to judge the adequacy of [his] conclusions.'" Pacheco v. Barnhart, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (quoting Rivera v. Sullivan,, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)). Courts in this Circuit have long held that an ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)).

III. Assessment of the Record

The heart of the ALJ's reasoning concerns the plaintiff's RFC, in which he found that plaintiff could not perform her prior work,

55

which involved light exertion, but was sufficiently robust to perform limited sedentary work. Based on that conclusion he determined that there were a sufficient number of jobs available in the national economy that were consistent with her limitations. We briefly summarize the highlights of his analysis.

The ALJ acknowledged that plaintiff suffered injuries to her neck, right shoulder, back and right thigh in the August 2003 accident. (See Tr. 13). He noted that subsequent to the accident, Dr. Holstein, a physician who treated her in October 2003, found damage to her cervical/lumbar spine. (Id. at 13-14). He then summarized the pain-management procedures performed by Dr. Bouhlev before her January 2004 shoulder surgery and some of what he did afterwards, including epidural steroid injections, trigger point injections, and occipital nerve blocks. The ALJ went on to find, citing Dr. Bouhlev, that plaintiff "finally experienced 'relief of radiating neck pain'" (id. at 15 (quoting Tr. 322)), in July 2004 but still suffered from lumbar pain radiating down her legs (reflected in a positive right straight-leg raising test), thus requiring, in August 2004, an epidural injection in her lumbar spine (one year after the accident). (Id.). He stated that these procedures occurred "within 12 months of the automobile accident." (Id.).

56

The ALJ then cited the September 2004 consultant report of Dr. King, who found that while plaintiff had "right hip pain" that "increased by walking" and "4/5 weakness of abduction in the right shoulder", her straight-leg raising was negative until after 60 degrees, her gait pattern was normal, she could "toe/heel walk" and x-rays of the lumbar spine "were within normal limits." (See id.). As the ALJ noted, Dr. King opined that plaintiff should avoid working at or above shoulder height on the right side and should avoid both repetitive bending or stooping and standing or walking for more than four hours. (See id.).[48]

The ALJ further highlighted a report by another SSA consultant, Dr. Schneider, in October 2004 (fourteen months after the accident), in which he alluded to the prior nerve block and other pain-alleviation procedures and recited that he found only "mild sensory impairment . . . on the right", which he viewed as "a mild and resolving neuropathy" with complete resolution to be expected in three to six months. (See id.). The ALJ then summarized the November 2004 Physical Residual Capacity Assessment conducted by Elizabeth Turner -- recognizing that she was not a physician -- who opined that plaintiff "could lift/carry a maximum of 20 pounds

---

[48] The ALJ did not address Dr. King's assessment of the status of plaintiff's cervical spine and did not explain why only x-rays were employed during his examination, rather than far more precise MRIs, as done in 2003. (See Tr. 14).

57

and sit/stand/walk for about 6 hours in an 8-hour day." (Id.).

As for plaintiff's shoulder problem, the ALJ referenced the report completed in January 2004 by Dr. Huish, plaintiff's physical therapist. (Id.). Dr. Huish had said that the shoulder "seemed to be improving" and that she could commence post-operative physical therapy. (See id.). The ALJ also noted that Dr. Huish still reported tenderness and spasm in the neck and back and recommended therapy for these regions as well. (Id.). The ALJ did not, however, mention Dr. Huish's April 2004 report, in which he found plaintiff was "unable to work at this point and continues to be temporarily totally disabled." (Id. at 256). He noted that "Dr. Huish did not indicate in [2004] that [plaintiff] reported any difficult with 'sitting'". (Id. at 15 (emphasis in original)).

Based on these records and the June 2005 report of Dr. Palmeri that plaintiff was in "mild distress" (nearly two years after the accident), the ALJ provided a series of findings that he would later use to justify his RFC conclusions. First, he noted that none of the medical records referred to plaintiff's ability to sit, an omission that he deemed significant. (See id.). Second, he found no evidence that the pain-alleviation treatments by Dr. Bouhlev had continued beyond June 2005 (nearly two years after the accident), even though that doctor had provided an October 2005 treating note

58

mentioning that plaintiff still complained of continued neck pain. (See id.). In the course of these findings, the ALJ did not mention that Dr. Bouhlev had administered still another lumbar epidural steroid injection as recently as November 3, 2005. He also did not mention the repeated findings of Dr. Palmeri that plaintiff should not be working.

As for plaintiff's claim that she suffered from depression or a related mental condition, the ALJ noted that she had undertaken no treatment. (See id.). He then went on to cite the findings of one of the SSA's consulting psychologists, Dr. Helprin, to the effect that plaintiff suffered from a few "mild" impairments but could perform a number of work-related functions, although the ALJ did not mention Dr. Helprin's finding that plaintiff suffered from a "moderate" adjustment disorder with "depressed mood" and that she should receive treatment. (See id.). He also did not mention the seemingly more negative findings of Dr. Marks, also an SSA consultant, who concluded that plaintiff suffered from "moderate limitations" in maintaining attention and concentration and in her ability to respond to "changes in the work setting", and that she was laboring under a moderate adjustment disorder with depression. Hence the ALJ concluded that plaintiff suffered only from a "mild" deficit in concentration, a problem insufficient to interfere with her ability to perform unskilled work under SSR 85-15.

59

Addressing plaintiff's mental functioning, the ALJ found "no deficits in [her] ability to perform ordinary daily activities of daily living[,] no deficits in her ability to socialize[, and] no decompensations." (Id.). He found that while she had a mild concentration deficit, because she could understand instructions, respond to supervision, deal with changes in a routine work setting, she had the "basic mental demands of competitive work." She also could respond appropriately to supervision and co-workers and use judgment, and was therefore "mentally capable of performing substantially all unskilled jobs and jobs with which [she] is familiar." (Id.).

In regard to her physical limitations, the ALJ found that plaintiff

> was seriously injured in August 2003; however, [clinical observations] also show gradual medical improvement since that time. [She] continues to experience neck pain and lower back pain, but it does not appear from the medical observations that [she] has been rendered as debilitated as she attested to during the course of her testimony at her hearing.

(Id. at 16). He found that that "[h]er testimony was not fully consistent with the treating medical evidence -- at least not to the disabling extent alleged." (Id.). In making this credibility finding about pain, the ALJ emphasized both the lack of any

60

reference in the medical record to plaintiff's capacity for sitting
(implying that this silence reflected an absence of complaints) and
plaintiff's testimony that she sits in a car to go to her doctor,
a trip of about one hour.[49] (See id.). He also rejected plaintiff's
numerical estimate of the pain as a "7 out of 10" (an estimate of
the pain without medication) because she had "never related [such
extreme pain] to any of her treating physicians" (see id.), but he
did not refer to plaintiff's extended history of treatment by Dr.
Bouhlev, the pain management specialist. He also seemed to question
her testimony that she took Vicodin three times a day because,
according to the ALJ, plaintiff had not proffered any "confirmation
of this excessive use of medication (such as pharmacy records)."
(See id.). Finally, he also noted that some of the physical
complaints she mentioned at her hearing (such as numbness in the
foot) find no reflection in the medical records, and that he had
never received an updated report from Dr. Bouhlev to confirm her
more recent treatment. (See id.). Hence, the ALJ concluded that she
was exaggerating her symptoms, and that in fact they were not so
intense as to preclude "basic work-related activities." (Id.).

    The ALJ then made RFC findings for plaintiff, which are
premised on the notion that she does have some pain-related

---

[49] The ALJ did not mention that plaintiff testified that she
needs to stop every half hour to stretch when driving in order to
stand, because of the pain. (Tr. 335-36).

limitations. He found that plaintiff could sit for up to eight hours a day, could stand and walk for up to four hours, and could lift or carry objects weighing up to ten pounds. The ALJ further stated that she could not "work at or above shoulder level on the right side more than 70% of the time . . . and cannot perform repetitive bending/stooping more than 50% of the time". The ALJ thus found that plaintiff could perform sedentary work, "which takes account of these limitations." (See id.).

The ALJ then turned to the so-called grid regulations, which may determine the outcome for disability claimants who, though unable to perform their prior job, do not suffer from a significant non-exertional impairment. Concluding that the limitations that he had found do "not preclude [plaintiff] from performing the full range of sedentary exertion level work," he determined that plaintiff was not disabled and that "the Guidelines . . . are dispositive and direct a finding that she is 'not disabled.'" (See id. at 17). In doing so, however, he did not address the types of work that she could perform and whether those jobs existed in the national economy in meaningful numbers.[50]

For reasons to be noted below, we conclude that the ALJ's

---

[50] The ALJ did not call a vocational expert to provide this information.

reasoning suffers from a number of defects that justify a remand
for further proceedings and additional findings. First, he failed
adequately to comply with the treating-physician rule in (1) not
addressing Dr. Palmeri's specific physical findings and repeated
statements that plaintiff was unable to work, (2) not addressing
Dr. Huish's assessment of plaintiff's shoulder through April 2004,
which appears to refute the opinion of Dr. Schneider, on which the
ALJ appeared to rely, (3) ignoring the full history of Dr.
Bouhlev's treatment of plaintiff, including notably the fact that
she was receiving steroid injections as late as November 2005, and,
(4) insofar as he did not give controlling weight to the findings
of plaintiff's treating doctors, the ALJ did not make clear why he
did not adopt the treaters' conclusions, what lesser weight he gave
to them and why, as required by the SSA regulations.

Second, insofar as he was relying on a statement by Dr.
Palmeri about plaintiff's "mild distress," he failed to develop the
record adequately to resolve the seeming conflict between that
observation and Dr. Palmeri's repeated statements that plaintiff
should not be working and his findings as to her physical problems.

Third, in finding no limitation in plaintiff's ability to sit,
the ALJ failed to develop the record, since he merely speculated
that the absence of any reference to sitting meant that plaintiff

63

had no problem in that regard, rather than obtaining explicit findings from the treating doctors. Moreover, this omission was exacerbated by his misstating plaintiff's testimony about her difficulty in sitting, since he cited her hour-long car trips to her doctor but ignored her testimony that she could not ride for more than half an hour without stopping in order to relieve the pain by standing up, that she no longer went to movies with friends because she could not sit for long periods of time, and that she suffered significant pain while sitting at the hearing.

Fourth, the ALJ failed to explain why plaintiff's pain, which was sufficiently intense to require treatment for longer than twelve months -- as recounted by Dr. Bouhlev when explaining his lengthy efforts to alleviate such pain through June 2005 -- did not demonstrate that she was disabled for the requisite twelve months, even if the pain later lessened.

Fifth, the ALJ ignored plaintiff's own testimony about other specific limitations caused by pain, and failed to address all of the regulatory criteria for evaluating a claimant's credibility.

Sixth, in dealing with the mental-health issue, the ALJ appeared at least in part to misstate the findings of Dr. Helprin and ignored those of Dr. Marks, in both instances without

64

explanation, and therefore did not attempt -- in the face of the psychologists' complete findings -- to justify his conclusion that plaintiff's mental condition not only did not preclude work but did not even constitute a sufficiently significant non-exertional factor to preclude reliance on the grid regulations.

Seventh, in determining plaintiff's RFC, the ALJ made specific findings about her ability to engage in work above shoulder level and in bending and stooping that appear to be unsupported by anything in the record. Indeed, he did not attempt to reconcile these findings with Dr. King's more conservative assessment that plaintiff cannot engage in any above-shoulder activity or any repetitive bending or stooping. (See id. at 16-17). Each doctor, whether treating or non-treating, found that plaintiff had less exertional capacity than the ALJ determined, and he failed to explain the basis for his reasoning.

Eighth, the ALJ failed to explain the evidentiary basis for directly applying the grid regulations, when the SSA's own consultants appeared to credit the existence of a potentially significant non-exertional limitation, that is, an adjustment disorder with at least moderate depression, as well as the non-exertional impact of her pain.

65

Ninth, although it is the burden of the SSA to establish that a claimant unable to do her prior job is able to perform work that is sufficiently available in the national economy, the ALJ failed to point to any evidence demonstrating that a person with the physical limitations that he found plaintiff to have -- much less a person with the more substantial limitations as found by the SSA's own consultant -- could perform jobs that were available in the economy.

We address these issues separately.

## A.   The ALJ Failed to Comply with the Treating-Physician Rule

### 1.   The Governing Standards

The SSA regulations state that "the opinion of a [plaintiff's] treating physician as to the nature and severity of [her] impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence'" in the record. Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw, 221 F.3d at 134; Rosa, 168 F.3d at 78-79 (stating that the ALJ cannot arbitrarily

66

substitute his own judgment for a competent medical opinion). This preference is generally justified because treating sources are likely to be "the medical professionals most able to provide a detailed, longitudinal picture" of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate. 20 C.F.R. § 416.927(d)(2).

Although the treating-physician rule generally requires deference to the medical opinion of a plaintiff's treating physician, Schisler v. Sullivan, 3 F.3d 563, 567-68 (2d Cir. 1993), the treating physician's findings need not be given controlling weight if they are inconsistent with other substantial evidence in the record, including -- when appropriate -- the opinions of other medical experts. Burgess, 537 F.3d at 588 (finding that a treating physician's opinion is not controlling when other substantial evidence in the record contradicts it); 20 C.F.R. § 404.1527(d)(2). Indeed, the opinions even of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record. See, e.g., Diaz, 59 F.3d at 313 n.5 (citing Schisler, 3 F.3d at 567-58 (upholding 20 C.F.R. § 404.1527(d))); Pratt v. Astrue, 2008

WL 2594430, at *11 (N.D.N.Y. June 27, 2008).[51] The findings of such consulting doctors are to be treated as opinion evidence pertinent to the nature and severity of the claimant's medical condition. They are not to be relied upon, however, for the ultimate determination of disability. 20 C.F.R. § 416.927(f)(2)(i).

It bears emphasis, as the Second Circuit recently observed, that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. Notably, this category includes a consultant's opinion rendered "in terms 'so vague as to make it useless in evaluating'" the claimant's residual functional capacity. Burgess, 537 F.3d at 129 (quoting Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)). Similarly, the opinions of consulting physicians -- whether examining or non-examining -- are entitled to relatively little weight where there is strong evidence of disability in the record, Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir. 1992), or in cases in which the consultant did not have a complete record before him. E.g., Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (citing Vargas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir. 1990); Hidalgo v. Bowen, 822 F.2d 294, 298 (2d

---

[51] The current SSA regulations effectively changed the rule initially recognized by the Second Circuit that the opinions of non-examining consultants could not be used to override a treating doctor's findings. See Schisler, 3 F.3d at 567-68.

Cir. 1987)).

Morever, even if the treating physician's opinion conflicts with other medical evidence that might be considered "substantial," the ALJ must still consider various "factors" to determine how much weight, if any, to give that doctor's opinion. Among those considerations are: 1) the frequency of examination and the length, nature and extent of the treatment relationship; 2) the weight of evidence supporting the treating physician's opinion; 3) the consistency of the opinion with the record as a whole; 4) whether the opinion is from a specialist; and 5) other factors brought to the SSA's attention that support or contradict the opinion. Burgess, 537 F.3d at 129 (quoting C.F.R. § 404.1527(d)(2)); Halloran, 362 F.3d at 32; Fox v. Astrue, 2008 WL 828078, at *8 (N.D.N.Y. Mar. 26, 2008). An ALJ must not substitute his "own assessment of the relative merits of the objective evidence and subjective complaints for that of a treating physician." Garcia v. Barnhart, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003) (citing Curry, 209 F.3d at 123).

Additionally, the regulations direct the Commissioner to "'comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.'" Burgess, 537 F.3d at 129 (quoting Halloran, 362 F.3d at 33 (citing 20 C.F.R. § 404.1527(d)(2))). In

other words, if an ALJ decides to give less than controlling weight to the claimant's treating physician, the ALJ must provide the claimant with "good reasons" for making this determination. Snell, 177 F.3d at 133; Van Dien v. Barnhart, 2006 WL 785281, at *14 (S.D.N.Y. Mar. 24, 2006) (citing 20 C.F.R. § 404.1527(d)(2)). There must be sufficient specificity in the ALJ's articulated reasoning to make "clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion." Disarno v. Astrue, 2008 WL 1995123, at *4 (W.D.N.Y. May 6, 2008) (quoting SSR 96-2p). "Failure to provide explicit 'good reasons' for not crediting a treating source's opinion is a ground for remand." Snell, 177 F.3d at 133 (quoting Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)); see also 20 C.F.R. § 404.1527(d)(2)).

If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). "A treating physician's failure to include objective support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." Fox, 2008 WL 828078, at *8 (citing

70

Rosa, 168 F.3d at 80); see also Schisler v. Heckler, 787 F.2d 76,
82 (2d Cir. 1986) (testimony of treating physician is itself
presumptively reliable and does not need to be supported by
objective or clinical evidence); Tavarez v. Barnhart, 124 Fed.
Appx. 48, 50 (2d Cir. 2008). This follows from the principle that
a hearing on disability benefits is a non-adversarial proceeding,
and that the ALJ therefore has an affirmative obligation to fully
develop the administrative record himself. Id. (citing Echevarria
v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir.
1982)). The ALJ bears this duty even when the claimant is
represented by counsel. Id. More specifically, "[t]he record as a
whole must be complete and detailed enough to allow the ALJ to
determine [plaintiff's] residual functional capacity." Casino-Ortiz
v. Astrue, 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing
20 C.F.R. §§ 404.1513(e)(1)-(3)). Toward this end, the ALJ must
make every reasonable effort to help an applicant obtain medical
reports from her medical sources. 20 C.F.R. § 404.1512(d).

Similarly, the ALJ has a duty to "seek additional evidence or
clarification from [the] medical source when a report from [that]
medical source contains conflict or ambiguity that must be
resolved, [or] the report does not contain all the necessary
information." 20 C.F.R. § 404.1512(e)(1); see Perez, 77 F.3d at 47.
In short, if a physician's report is believed to be insufficiently

71

explained, lacking in support, or inconsistent with the physician's
other reports, the ALJ must seek clarification and additional
information from the physician, as needed, to fill any clear gaps
before rejecting the doctor's opinion. See, e.g., Rosa, 168 F.3d at
79 (citing Shaal, 134 F.3d 505 ("even if the clinical findings were
inadequate, it was the ALJ's duty to seek additional information .
. . sua sponte")).


### 2.   The ALJ Ignored the Treating Doctors' Opinions and Other Evidence and Failed to Make the Necessary Findings


In this case, ALJ Katz rejected -- either explicitly or
implicitly -- the key findings of plaintiff's treating sources.
While he never made clear the evidentiary or testimonial support
for his RFC finding, he appeared to rely largely on the opinions of
Dr. King and Ms. Turner, the examining consulting orthopedic
surgeon and the non-physician state agency reviewer. In doing so,
however, he failed to comply with SSA regulations that require him
to address the evidence supporting the treating doctors' opinions
and to explain why he was rejecting or giving lesser weight to
plaintiff's treating sources' opinions.


Dr. Palmeri treated plaintiff extensively after her motor
vehicle accident on August 15, 2003. The record indicates that Dr.
Palmeri examined plaintiff at least once a month from September

2003 to December 2004 and then once again in May 2005. (Tr. 267-318). Dr. Palmeri also provided the Appeals Council with an updated report on June 27, 2006, reporting virtually the same findings as were contained in his prior reports in the record before the ALJ. (Id. at 359).

Dr. Palmeri originally diagnosed plaintiff with post-concussive syndrome, cervical strain with herniated disc and radiculopathy, lumbar strain with possible herniated nucleus pulposis, right shoulder impingement syndrome with possible rotator cuff tear, right elbow contusion and a right knee sprain. (Id. at 314). Plaintiff eventually had to undergo surgery on her right shoulder in January 2004, that surgery revealing further injuries, including a partial rotator cuff tear, a tear of the superior labrum, a partial tear of the biceps tendon and acromiclavicular arthrosis. (Id. at 178).

Over the next two years, Dr. Palmeri consistently noted that plaintiff suffered from an antalgic gait pattern as well as a limited range of motion in the cervical spine, right shoulder and lumbar spine. (Id. at 267-314, 359). Dr. Palmeri did note some improvement in plaintiff's right shoulder following the arthoscopic surgery, but also observed a continuing weakness in comparison to her left shoulder. (Id. at 267-89, 359). Also, while plaintiff's

73

right knee improved after August 2004, Dr. Palmeri continued to note a persistent tenderness since the motor vehicle accident. (Id. at 267-74). Dr. Palmeri also found that plaintiff experienced persistent pain in her right hip. (Id. at 267-303, 359). The only injury that resolved itself quickly was plaintiff's right elbow tenderness, which Dr. Palmeri did not mention after September 2003. (Id. at 306-14).

Notably, Dr. Palmeri recommended in virtually every report that plaintiff should "remain out of work." (Id. at 267-314, 359). He also always recommended follow-up visits, physical therapy sessions, pain management sessions and courses of various medications. (Id. at 267-314, 359).

Dr. Palmeri referred plaintiff to Dr. Huish for physical therapy. (Tr. 264). Plaintiff also received acupuncture treatments from Dr. Huish on two occasions. (Id. at 248, 251, 253). Dr. Huish, like Dr. Palmeri, treated plaintiff regularly from October 2003 to August 2004. (Id. at 190-205, 247-66).

In Dr. Huish's initial consultation of plaintiff, he noted that plaintiff suffered from cervical and lumbar strain, a right knee contusion, a right shoulder sprain and right elbow epicondylitis. (Id. at 265). His later reports note that plaintiff

74

continued to experience a restricted range of motion in her hip, cervical spine and lumbar spine. (Id. at 247-66). Dr. Huish did note an improving range of motion in plaintiff's shoulder post-arthoscopic surgery, but he too -- like Dr. Palmeri -- noted that there was persistent weakness of the rotator cuff. (Id.; see id. at 268-70, 280-83).

Notably, on April 26, 2004 -- approximately eight months after the accident -- Dr. Huish opined that plaintiff was "unable to work at this point and continue[d] to be temporarily totally disabled." (Id. at 256). This is consistent with Dr. Palmeri's report dated just a few days prior, on April 20, 2004, which recommended that plaintiff remain "out of work." (Id. at 280). On July 29, 2004, Dr. Huish noted plaintiff was "still having some pain...[in] the right shoulder, especially with lifting, carrying, pushing, pulling, etc." (Id. at 248). He recommended that plaintiff undergo physical therapy for her right shoulder, right knee, spine, lower back, right hip and neck for approximately the year following the accident. (Id. at 247-66).

Dr. Palmeri also referred plaintiff to Dr. Bouhlev in his report dated October 13, 2003 for a pain management consultation. (Id. at 298). Dr. Bouhlev treated plaintiff from November 2003 to

November 2005.[52] (See id. at 354). In Dr. Bouhlev's initial consultation with plaintiff in November 2003, he noted that plaintiff suffered from cervical and lumbar radiculopathy, with pain radiating to her lower and upper extremities. (Id.). Over the next two years, plaintiff received two epidural steroid injections to the cervical spine, a series of epidural steroid injections to the lumbar spine, one epidural steroid injection to her hip, multiple trigger point injections and a right-sided occiptal nerve block to deal with "intractable" headaches. (Id. at 151-52, 167-68, 186-88, 206-07, 324-26, 354). Dr. Bouhlev did note some improvement in plaintiff's pain after the injections, but he also observed that the injections were not enough to keep plaintiff's pain under control. (Id. at 322, 327). Dr. Bouhlev, like Dr. Palmeri, also noted in his updated report on March 9, 2006 that plaintiff suffered "with antalgic gait." (Id. at 354).

In support of these findings, Dr. Palmeri, Dr. Huish, and Dr. Bouhlev provided consistent evaluations of plaintiff from their examinations spanning the approximate one-to-two-year period when

---

[52] There is some issue as to whether an updated report from Dr. Bouhlev dated March 9, 2006 and referencing treatment received in November 2005 was made a part of the record for ALJ Katz. Plaintiff argues it was submitted the same day it was dated and if that is true, it seems the ALJ did not consider this report as a part of the record in issuing his decision. (Pl.'s Mem. 6-7). The report lists findings in line with the reports of Dr. Huish and Dr. Palmeri. (Tr. 190-205, 247-66, 267-314, 359).

76

they treated plaintiff, with the last evaluation being a report by Dr. Bouhlev noting continued pain-management steroids injections in November 2005, more than two years after the accident. (Id. at 141-73, 183-89, 319-27, 354). All three treating sources, in their reports, consistently indicated that plaintiff should continue her course of medication in addition to physical therapy and pain management. (Id.). These reports are also substantiated by MRI reports and other medical evidence in the record, including the neurological examination by Dr. Holstein. (See Tr. 125-29, 138-40).

These findings, the treating doctors' recommendations for plaintiff to continue her course of treatment and the repeated statements that plaintiff should remain out of work were potentially quite significant for assessing plaintiff's ability for full-time work. The ALJ, however, summarized only a portion of the treating sources' findings and instead appeared to adopt the recommendation of Dr. King, a consulting orthopedic surgeon, who had examined plaintiff only once but whose findings, though more conservative, most closely matched those of the ALJ. (See id. at 13-17). The ALJ endorsed Dr. King's opinion, also adopted by Ms. Turner, that plaintiff should only avoid working at or above shoulder level, avoid repetitive bending and stooping and avoid standing or walking over four hours in a regular workday. (See id.

77

at 17, 223).

While the ultimate determination as to disability does rest within the discretion of the Commissioner, he is still required to assess the findings of a treating source when determining the "nature and severity" of a plaintiff's impairment and to explain why he is rejecting them or what weight was given to them. 20 C.F.R. §§ 404.1527(d)(2), 404.1527(e). See Newbury v. Astrue, 321 Fed. Appx. 16, 18 (2d Cir. 2009) (quoting Snell, 177 F.3d at 143 (explaining that though the ultimate finding of disability is reserved to the Commissioner, the ALJ is still obligated to explain why a treating physician's opinion is not being credited)); see also DiSarno, 2008 WL 1995123, at *4 (quoting SSR 96-2p).

The ALJ failed to satisfy these requirements. Rather, he cited selected portions of plaintiff's treating sources' opinions and did not meaningfully assess those reports as a whole. In doing so, the ALJ failed to comply with a number of requirements embodied in the treating-physician rule.

As noted, if the findings of a treating physician are deemed not binding, the ALJ must specify what weight he gives them and must provide a detailed explanation for that determination, guided by the criteria specified in the regulations. Burgess, 537 F.3d at

129; Halloran, 362 F.3d at 33. The ALJ failed, however, to cite, much less discuss, the findings of these treating sources other than to note Dr. Palmeri's "mild distress" comment. He failed also to address the potential tension between that phrase and the more specific, and severe, findings of Dr. Palmeri (as well as those of Dr. Bouhlev and Dr. Huish) about plaintiff's continuing physical deficits and pain, which were corroborated by both observations of muscle spasms and by other physical tests administered by the doctors. (Id. at 247-66, 267-314, 319-27, 354, 359). The ALJ further failed to address the significance of the continued administration of pain block and steroid injection treatments by Dr. Bouhlev -- treatments that continued for more than two years after the accident. Having ignored those key aspects of her treatment and her doctors' explanations of their findings, the ALJ also did not make explicit what weight he gave to the views of Dr. Palmeri, Dr. Huish and Dr. Bouhlev. The ALJ also failed to explicitly discuss the consistency of the treating doctors' findings and their indications that plaintiff suffered from severe limitations.

In short, the ALJ never followed the analytical path mandated by regulation, which requires that he discuss the length of treating relationship, the expertise of the treating doctors, the consistency of their findings and the extent to which the record

79

offers support for some or all of those findings. See Burgess, 537
F.3d at 129 (quoting C.F.R. § 404.1527(d)(2)); Fox, 2008 WL 828078,
at *8.

### 3. The ALJ Failed to Fulfill his Affirmative Obligation to Develop the Record

In assessing plaintiff's disability claim, the ALJ did not
pursue relevant, and possibly crucial, information from her
treating sources that was absent from their submissions but
necessary to assess their findings. He therefore failed to complete
the record, as required by 20 C.F.R. §§ 404.1512(d) & (e).

There are two significant evidentiary holes or ambiguities in
the medical record that the ALJ failed to address. First, although
he cited Dr. Palmeri's June 2005 description of plaintiff as being
in "mild distress," he ignored the fact that Dr. Palmeri had made
a variety of physical findings between September 2003 and June 2005
indicating continuing serious physical problems. (Tr. 270, 275,
277, 280-81, 285). The seeming tension between the term "mild
distress" and the doctor's other findings should have alerted the
ALJ to the need for clarification from Dr. Palmeri concerning the
seriousness of plaintiff's condition and its impact on her ability
to work in light of these seemingly conflicting findings. Cf.

McGowan v. Astrue, 2009 WL 792083, at *10 (E.D.N.Y. Mar. 23, 2009) (citing Clark, 143 F.3d at 118) (explaining that an ALJ is not relieved of his affirmative obligation to seek clarifying information from plaintiff's treating sources when inconsistencies are discovered within their reports). Instead, the ALJ failed to request further information from Dr. Palmeri to clarify those inconsistencies, and further did not even mention the more severe physical findings and repeated recommendation that plaintiff should remain out of work. (See Tr. 13-17).[54]

Second, at the very least, "mild distress" may be viewed as inconsistent with Dr. Palmeri's recommendations over the course of approximately two years that plaintiff remain out of work. Indeed, Dr. Palmeri had reported that plaintiff was in "mild distress" beginning with his first report, dated September 2003, through his last report, dated June 2005. (Id. at 267-313). While the ALJ noted that Dr. Palmeri had found plaintiff to be in "mild distress" as of June 2005, he cited that report in support the notion that plaintiff had improved by then and was no longer unable to work. (Id. at 15). However, if Dr. Palmeri described plaintiff as being in "mild distress" while also unable to work, it is unlikely that

---

[54] There is a reference in the record to an April 2006 phone request to Dr. Palmeri for any more recent records, but this did not represent an effort by the ALJ to clarify the cited ambiguities. (Id. at 116).

in June 2005 he described her as being in "mild distress" to demonstrate that she had notably improved medically since being injured in August 2003. If the ALJ was tempted to make an inference from these portions of Dr. Palmeri's reports -- which on the face of the record is unfounded -- he should, at a minimum, have requested clarification of Dr. Palmeri's seemingly conflicting findings before reaching a determination on whether plaintiff was disabled. Cf. McGowan, 2009 WL 792083, at *10 (citing Clark, 143 F.3d at 118).

The ALJ also failed to assess or even mention Dr. Huish's statement in April 2004 that plaintiff remained unable to work and was temporarily disabled and his later report, in July 2004 (eleven months after the accident), that she continued to suffer from shoulder pain and needed further treatments. (See Tr. 13-17). The ALJ instead cited only a January 2004 evaluation conducted by Dr. Huish, dated shortly after plaintiff underwent arthoscopic surgery on her right shoulder, as an example of plaintiff's gradual medical improvement. (See id. at 14-15). Moreover, it is not even clear that the January 2004 report can been given the weight that the ALJ put on it. In that report, Dr. Huish observed that plaintiff could begin physical therapy on her shoulder in light of her recent surgery, but he also noted her continuing back pain and the need for therapy in the lumbar and cervical spine. (Id.).

82

B.   Plaintiff's Purported Unlimited Ability to Sit

The ALJ determined that plaintiff could not perform her past relevant work, but that she could still perform other jobs that exist in significant numbers in the national economy. (Tr. 17-18). The premise for this determination was the RFC findings adopted by the ALJ, which he appears to have grounded in part in Dr. King's assessment of plaintiff, and in part in his own rank speculation regarding her abilities. Of particular significance, he stated that he found it "significant" that there was no medical evidence in the record that plaintiff had any limitations on her ability to sit. He noted that Ms. Turner, who solely reviewed the paper record when completing the November 2004 Physical Residual Capacity Assessment "opined that [plaintiff] could . . . sit/stand/walk for about 6 hours in an 8-hour day." (Id. at 14). He went on to state that Dr. Huish "did not indicate in January [2004] that the [plaintiff] reported any difficult with 'sitting' activities" (id. at 15) (emphasis in original), and that "none of the many clinical observations [of any physician] mention any restriction on [plaintiff's] ability to sit." (Id.) (emphasis in original). He recognized that plaintiff had testified that she had "significant problems 'sitting', but she admitted that she can (at least) [sic]

83

is able to travel by car for about one hour"[55] and credited plaintiff with the ability to perform a full range of sedentary work. (Id. at 16-17).

Among the information that the SSA is required to obtain from a treating source at stage five of the SSA analysis is "a statement of what [the claimant] can still do despite [her] impairment(s) based on her acceptable medical sources' findings on her factors under paragraphs (b)(1) through (b)(5) of this section." 20 C.F.R. § 404.1513(b)(6). However, the ALJ did not request from Dr. Palmeri or any of the other treating source an assessment of plaintiff's residual functional capacity. This constituted a failure to comply with 20 C.F.R. § 404.1513(b)(6) and a failure to complete the medical record, as required when there is insufficient evidence to determine disability under 20 C.F.R. § 404.1527(c)(3).

These failures also undercut the ALJ's factual determination that plaintiff can perform work other than that required in her "past relevant work" in the fifth step of his analysis. The absence

---

[55] The ALJ failed to discuss plaintiff's explicit testimony that she could not sit in a car for more than half an hour (id. at 336, 340); that when sitting, even after stretching, neck pain returned in ten or fifteen minutes (id. at 340); or that she stated that when she sat her neck and right leg went numb due to her pinched nerve and herniated disks. (Id. at 336-37).

of medical evidence on the question of sitting capacity renders his conclusion that she can sit for six hours of an eight-hour day wholly unsupported by evidence. Indeed, the only evidence on the record regarding her ability to sit -- plaintiff's own testimony, her statements to Dr. King that she could not sit for long periods,[55] and the medical reports over a two-year period of persistent pain radiating to her legs and arms -- support an alternate conclusion that she cannot perform sedentary work. While the ALJ was not required to credit her testimony, in his conclusions he in fact improperly misstated it and he certainly cannot rely on the absence of medical evidence as a basis for finding that plaintiff is not disabled.

## C. The ALJ Failed to Address Medical Evidence of Twelve Months of Assorted Disability Pain

In the course of the ALJ's analysis, he seems to suggest -- without quite saying -- that plaintiff may have been unable to work for a period of time after the accident, but that she recovered sufficiently before the expiration of one year to go back to work. As noted, if a claimant can return to work in less than one year, she fails to meet the statutory requirement for disability. On the

---

[55] Despite plaintiff's complaints, Dr. King drew no conclusions regarding her ability to sit. (Tr. 217)

85

other hand, if the claimant cannot work for at least a year, she would be found disabled for the period that she was unable to work. 42 U.S.C.§ 423(d)(1)(A).

Putting to one side all of the other evidence about plaintiff's various physical complaints, the record reflects a strikingly suggestive body of evidence supporting her contention that she was disabled for more than a year, and the ALJ simply ignored the question. As noted, in early 2004 plaintiff was referred to Dr. Bouhlev, a pain management specialist, who proceeded over a period of time extending to nearly two years to administer a series of pain blocks, trigger point injections and steroid injections, principally to address both cervical and lumbar pain. Morever, the significance of these efforts was underscored by observations from Dr. Bouhlev that seemed to coincide with plaintiff's subjective complaints and the assessments of Dr. Palmeri and Dr. Huish.

The ALJ was free to assess the evidence and, if he found it unpersuasive, to reject it, provided that he explained his reasons for his rejection of her evidence. Instead the ALJ, although mentioning in passing that Dr. Bouhlev administered pain injections until June 2005 (itself an error, since the record reflects that

86

additional treatment was received as late as November 2005), ignored it when describing his conclusions. Moreover, he failed to explain why this evidence did not adequately support the conclusion that plaintiff was not capable of work within the year after the accident. Finally, the ALJ failed meaningfully to address the length of plaintiff's treatment by Dr. Bouhlev or to assess its significance.[56]

An ALJ must acknowledge all evidence that supports a claim of disability and, if he concludes otherwise, he must explain why the pertinent evidence does not justify the result sought by the claimant. Simply mentioning the existence of such evidence (wholly apart from necessity of it) does not satisfy this requirement.

## D.   The ALJ's Assessment of Plaintiff's Credibility

When there is conflicting evidence about the extent of a claimant's pain, the ALJ must evaluate her credibility. See, e.g.,

---

[56] It also bears noting that, to the extent that the ALJ seemed to place significance on his asserted notion that Dr. Bouhlev ended treatment after June 2005, this clearly suggests error on his part. If the treatment had ended there, the record would reflect the need for active pain management for well over a year after the accident. The fact that it supposedly ended there does not tend to demonstrate -- as the ALJ seemingly mistakenly believed -- that plaintiff was not disabled after July 2004, eleven months after the accident.

87

Snell, 177 F.3d at 135 (citing Donato v. Sec'y of Health and Human Servs., 721 F.2d 414, 418-19 (2d Cir. 1983)). In this case, the ALJ found that plaintiff "does not appear from the medical observations . . . [to be] rendered as debilitated as she attested to during the course of her testimony at her hearing." (Tr. 16). Further, the ALJ stated that plaintiff's "subjective complaints are not fully corroborated by the objective medical evidence, are somewhat inconsistent with the record, and cannot be given substantial weight". (Id.). The ALJ committed several errors in evaluating her credibility.

An ALJ is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." Rivers v. Astrue, 280 Fed. Appx. 20, 22 (2d Cir. 2008). The weight to be assigned to such testimony is within the ALJ's discretion. E.g., Schultz, 2008 WL 728925, at *12 (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)). Morever, where the ALJ's findings are supported by substantial evidence, they are conclusive. See Marcus, 615 F.2d at 27 (citing Perales, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. First, throughout the five-step process, "'the subjective element of

[plaintiff's] pain is an important factor to be considered in determining disability." Perez v. Barnhart, 234 F. Supp 2d 336, 340 (S.D.N.Y. 2002) (quoting Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984)). Second, in assessing the claimant's testimony, the ALJ must take all pertinent evidence into consideration. E.g., id.; see also Snell, 177 F.3d at 135 (holding that an ALJ is in a better position to decide credibility than the Commissioner). Even if subjective pain is unaccompanied by positive clinical findings or other objective medical evidence,[57] it may still serve as the basis for establishing disability. See, e.g., Fox, 2008 WL 828078, at *12. If the claimant's testimony as to pain is not fully supported by clinical evidence, the ALJ must consider additional factors in his assessment. Id. These include: 1) the claimant's daily

_____

[57] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704, at *11, n.21 (citing 20 C.F.R. § 404.1529(c)(2)).

Medical signs are "anatomical, physiological, or psychological abnormalities which can be observed, apart from [claimant's symptoms]. Signs must be shown by medically acceptable clinical diagnostic techniques...[and] observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques [sic]. Some of these diagnostic techniques include chemical tests, electro-physiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

activities; 2) the location, duration, frequency and intensity of symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vi). See also Wright v. Astrue, 2008 WL 620733, at *3 (E.D.N.Y. Mar. 5, 2008). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain are consistent with the objective medical and other evidence. Schultz, 2008 WL 728925, at *12 (citing Social Security Ruling 96-7p)⁵⁸; Fox, 2008 WL 828078, at *12.

If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons

---

⁵⁸ Social Security Ruling 96-7p states, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. §§ 404.1529(c) and 416.929(c) describe the kinds of evidence . . . that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements." See SSR 96-7p.

for the ALJ's disbelief and whether his decision is supported by substantial evidence. <u>Schutz</u>, 2008 WL 728925, at *12 (citing <u>Martone v. Apfel</u>, 70 F. Supp. 2d 145, 151 (N.D.N.Y. 1999)); <u>Melchior v. Apfel</u>, 15 F. Supp. 2d 215, 220 (N.D.N.Y. 1998); <u>see also</u> 20 C.F.R. § 404.1529(c)(4). Absent these findings, remand is appropriate. <u>Hardhardt v. Astrue</u>, 2008 WL 2244995, at *10-11 (E.D.N.Y. May 29, 2008); <u>see also</u> <u>Knapp v. Apfel</u>, 11 F. Supp. 2d 235, 238 (N.D.N.Y. 1998) ("a finding that the Commissioner has failed to specify the basis for his conclusions is [a] compelling cause for remand."). Furthermore, if the ALJ reviews the record evidence using an improper legal standard, his determination will not be upheld. <u>Marcus</u>, 615 F.2d at 27 (citing <u>Northcutt v. Califano</u>, 581 F.2d 164, 166 (8th Cir. 1978)).

In this case, the ALJ found that plaintiff's testimony as to her pain and its impact on her ability to function was not credible, at least to the "disabling extent" that she testified in December 2005. (Tr. 16). In explanation, he found that plaintiff's report that she had difficulty sitting was contradicted by her confession that she can travel by car to doctor appointments, a trip of approximately an hour. (<u>Id</u>.). Further, he found that although plaintiff had related that her pain was a "'7 out of 10,'" she had never mentioned such extreme pain to her physicians. (<u>Id</u>.). The ALJ also noted that plaintiff had testified that she took

Vicodin two to three times a day, depending on the severity of her pain, but questioned her testimony because she did not submit any documentation -- such as pharmacy records -- to demonstrate such "excessive use." (Id.). Other findings of the ALJ in support of his rejection of her testimony about pain included a statement that plaintiff had not submitted an updated report from Dr. Bouhlev though it was promised by her attorney and a finding that other injuries about which she had testified to -- such as numbness in her right foot and bilateral hand impairments -- were not substantiated by the medical record. (Id.).

Based on these findings, the ALJ concluded that the medical signs and findings "suggest that the intensity, persistence and functionally limiting effects of [plaintiff's] symptoms do not preclude her ability to perform basic work-related activities." (Id.). He then found that her complaints were not fully substantiated by the record and therefore they could not be given "substantial weight" despite her "fine work history." (Id.).

While the ALJ did cite the appropriate rules in assessing plaintiff's credibility (see id. at 16) and it is within his discretion to assign the weight that her testimony is to receive, he erred in a number of respects. See also 20 C.F.R. §

92

404.1529(c)(3)(i)-(vi); Schultz, 2008 WL 728925, at *12 (citing Marcus, 615 F.2d at 27); Wright, 2008 WL 620733, at *3).

First, as noted, the ALJ found that though she testified to having difficulty sitting because of pain, there was no report on the record from any treating or non-treating source that mentioned this difficulty, and that it was contradicted by plaintiff's testimony that she could travel up to an hour to doctor appointments. (Id.). As we have noted, the ALJ misstated plaintiff's testimony -- in which she reported that she had to stop and stretch when driving in order to relieve the pain -- and ignored her testimony that she was in pain at the hearing from prolonged sitting. He further ignored the medical evidence that she experienced serious injuries to her right side and experienced pain from her upper right extremities to her lower right extremities, including radiating pain to her legs, over approximately a two-year period.

Again, as noted, the ALJ cannot rely on evidentiary gaps when determining whether a plaintiff has a RFC to perform certain work; he must instead support his determination with positive evidence. Rodriquez v. Apfel, 1999 WL 511867, at *4 (S.D.N.Y. July 19, 1999)(citing Rosa, 168 F.3d at 81, 83).

93

Second, the ALJ noted that when asked to describe her pain, on a scale of one to ten, she said a "7" -- at least absent any medication. (Id. at 16). Rejecting this estimate, the ALJ assumed that she had never related such extreme pain to her physicians. (Id.). Again, this is a misleading statement, as reports from Dr. Palmeri, Dr. Bouhlev and Dr. Huish note that plaintiff complained of persistent pain without relief. (Id. at 248, 267, 354). In fact, Dr. Huish noted on June 7, 2004 that plaintiff experienced "persistent chronic pain." (Id. at 253). Morever, Dr. Bouhlev stated that even epidural steroid injections were not enough to keep plaintiff's pain symptoms under control. (Id. at 322, 327). In short, the ALJ either failed to take into account reports spanning over a two-year period documenting plaintiff's persistent pain without relief or concluded that the reports did not contain the word "extreme" and thus failed to correspond to a "7." Regardless, his failure to take into account all pertinent evidence is plain error. Kuleszo, 232 F. Supp. 2d at 57 (citing Pagan, 923 F. Supp. at 556).


Third, as evidence of incongruous testimony the ALJ noted plaintiff had reported taking Vicodin three times a day, but did not submit documentation of such "excessive use". (Id. at 16). This finding and the inference that the ALJ draws from it are indefensible. Although the medical reports in the record do not

94

recite how many times a day plaintiff took Vicodin, they do confirm that plaintiff took such medication, and her treating doctors recommended that she should continue her course of medication.[59] (Id. at 247, 267). The fact that plaintiff was taking such pain medication over a two-year period is, if anything, another indication that she was experiencing serious pain since the motor vehicle accident. Morever, the ALJ failed to mention other medications -- including Ambien, Naprosyn, Celebrex, amitriptylin and Zanaflex -- that plaintiff had taken over the two-year period and how they affected her overall functioning, again failing to take into account all pertinent evidence. (Id. at 256, 258, 264, 267-272, 283, 303, 314, 323, 327); See Kuleszo, 232 F. Supp. 2d at 57 (citing Pagan, 923 F. Supp. at 556). Furthermore, it bears mentioning once again that the SSA regulations state that the plaintiff's account of her pain will not be rejected "solely because the available objective medical evidence does not substantiate [plaintiff's] statements." 20 C.F.R. § 404.1529(c)(2). Accordingly, if the ALJ thought that documentation regarding plaintiff's actual use of the medication was important, he should have developed the record further by requesting such information. Even without that documentation, however, it does not seem that the medical evidence substantiates his conclusion.

---

[59] Dr. Helprin noted in her evaluation of plaintiff that she took Vicodin (b.i.d.). (Tr. 210).

Fourth, the ALJ stated that plaintiff had not submitted an updated report from her pain management specialist, and weighed this failure against her. (Id. at 16). As already discussed, plaintiff did submit an updated report from Dr. Bouhlev in March 2006 that directly contradicts some of his findings, and that was not considered by the ALJ in his analysis. Defendant's counsel speculates that the ALJ did not receive this document before he issued his decision, but the record does not support this claim. (See id. at 8, 354; Pl.'s Mem. 7-9). Without any evidence that plaintiff failed to submit the report in March, the alternate possibility, that the report may have been mishandled within the offices of the SSA, should certainly not be used against plaintiff. In any event, this report was available for the Appeals Council to consider in its decision, and should be addressed on remand. Finally, wholly apart from this last report, the ALJ must address the undisputed fact that plaintiff was receiving pain injections nearly two years after the accident when considering her subjective testimony regarding her pain, which he failed to do.

Fifth, the ALJ found that plaintiff complained of other ailments, notably a numb foot and carpel tunnel syndrome, which are not substantiated by the record. (Id. at 16). An early nerve report conducted of plaintiff does show that plaintiff's condition seemed consistent with carpel tunnel syndrome, although later reports note

96

no evidence of this specific condition. (Id. at 138, 221, 313).
Moreover, plaintiff did testify that she had difficulty writing
after ten to fifteen minutes, and she may indeed have suffered
wrist pain without having carpal tunnel syndrome. (Id. at 340-41).
The ALJ did not mention these facts and, insofar as he discussed
the reliability of plaintiff's testimony, his analysis is at least
incomplete in this respect. As for numbness in her foot, reports of
Dr. Palmeri, Dr. Huish and Dr. Bouhlev note persistent pain in
plaintiff's lower right extremity. It is not unreasonable to
conclude that plaintiff experienced some pain in her foot. The ALJ
should have further developed the record to clarify this ambiguity.
See Tavarez, 124 Fed. Appx. at 51; Taylor v. Barnhart, 117 Fed.
Appx. 139, 141 (2d Cir. 2004).


Lastly, in assessing plaintiff's credibility, the ALJ did not
meaningfully evaluate her ability to perform daily activities.
Plaintiff testified, and the ALJ did not discuss, that she had
difficulty gripping items, that she had to have someone wash her
hair, that she had to wear shirts that did not have to be pulled
over her head and that she had to wear shoes that did not need to
be tied. (Id. at 341, 344-45). The ALJ furthermore did not mention
plaintiff's testimony that she had difficulty sleeping because of
pain and as a result, woke up several times during the night. (Id.
at 342-43). This once again is an example of the ALJ not taking

97

into account all pertinent evidence in the record. See Kuleszo, 232
F. Supp. 2d at 57 (citing Pagan, 923 F. Supp. at 556).


In short, the ALJ's assessment of plaintiff's credibility is
not supported by substantial evidence in the record, he failed to
fully develop the record regarding questions he had about
plaintiff's credibility, and he did not address all pertinent
evidence in the record.


E.   The ALJ's Treatment of the Mental-Health Evidence


ALJ also committed legal error in assessing the opinions of
Dr. Helprin and Dr. Marks, the examining and non-examining
consulting psychologists, and as a consequence he improperly
directly relied on the grid regulations to determine whether
plaintiff is disabled.


Plaintiff reported no history of medical-health treatment, but
testified that she was suffering from depression as a result of the
accident and its impact on her life. Dr. Helprin, who examined
plaintiff, found that she suffered from an adjustment disorder with
moderate, episodic depression and mild impairments of attention,
concentration, and memory skills, and recommended that plaintiff

98

seek individual psychological therapy for pain-management purposes. (Id. at 213). Dr. Marks, who did not examine plaintiff but reviewed the medical record, also determined, and appeared to rely on Dr. Helprin's findings, that plaintiff suffered from an adjustment disorder with moderate, episodic depression and moderate difficulties in maintaining concentration and in adapting to changes in the work setting. (Id. at 229-30).

The ALJ noted Dr. Helprin's findings that plaintiff spoke fluently and clearly, that "her thought processes were 'coherent and goal directed,'" and that her insight and judgment were good. (Id. at 15). He also noted that Dr. Helprin had found that plaintiff suffered from mild impairments of concentration, memory, and attention. (Id.). He did not refer at all to her findings that she suffered from moderate, episodic depression or an adjustment disorder, and did not refer at all to Dr. Marks' report. (See id.).

In short, the ALJ cherry-picked some of the findings of the Dr. Helprin -- notably those that minimized plaintiff's psychological limitations -- and ignored others. This was of course improper. Moreover, the finding that plaintiff suffered from an adjustment disorder and moderate, episodic depression had a potentially significant practical effect, as depression and

psychological disorders are considered non-exertional limitations.
See 20 C.F.R. § 404.1569a(c)(2). The grid regulations may not be
relied upon as the exclusive determinant of disability status if a
claimant also suffers from a significant non-exertional limitation.
See Butts, 388 F.3d at 383 (citing Rosa 168 F.3d at 78). Whether
plaintiff's   psychological   issues   constitute   non-exertional
limitations and therefore require a non-grid assessment is a matter
that the ALJ ignored, seemingly based on his failure to recognize
the ultimate findings of Dr. Helprin and Dr. Marks. Therefore, this
was error.

D.   The  ALJ's  Determination  of  Plaintiff's  Residual
     Functional  Capacity  is  Not  Supported  by  Substantial
     Evidence in the Record

In making his RFC findings, the ALJ relied principally on Dr.
King's consultation report and Ms. Turner's assessment, but
modified those findings without apparent basis. Dr. King opined
that plaintiff should "avoid working at or above shoulder level on
the right side, [avoid] repetitive bending and stooping . . . [and
should] avoid standing or walking over four hours per eight-hour
period" (Tr. 217), and Ms. Turner echoed this opinion. (Tr. 227).
The ALJ, however, determined that plaintiff could "sit for a total
of 8 hours...stand/walk for a total of 4 hours in an 8-hour workday
. . . lift/carry objects weighing a total of 10 pounds. . . . She

cannot, however, work at or above shoulder level on the right side more than 70% of the time during a typical workday and cannot perform repetitive bending/stooping more than 50% of the time during a typical workday." (Id. at 16).

As already noted, both Dr. King's report and the bulk of the medical record contain no specific estimates of plaintiff's ability to sit, but evidence in the record strongly suggests that she had considerable difficulty sitting for prolonged periods. In addition, to the extent that the ALJ opined that she can work above her shoulder 70% percent of the time and could bend and stoop 50% of the time, he offered no explanation, an error particularly notable since it conflicted even with Dr. King's finding that she should avoid all work above her shoulder and should not repetitively bend or stoop. It also bears emphasis that the balance of the medical record -- including particularly the continuing need for pain management by Dr. Bouhlev -- strongly implies that even sedentary work would be difficult for plaintiff. Hence, it is unclear on what basis the ALJ reached his specific RFC findings, as they contradict those noted by Dr. King and have no evidentiary or testimonial support. This represents another failure, as the ALJ must adequately explain the reasoning underlying an RFC determination and the basis on which it rests. See, e.g., Diaz, 59 F.3d at 315; Ferraris, 728 F.2d at 586-87; cf. Allen, 2006 WL 2255113, at *10.

101

The ALJ further found that plaintiff can "lift/carry objects weighing a total of 10 pounds." (Tr. 16). In his discussion, however, the ALJ merely referenced Ms. Turner's finding that plaintiff had the ability to lift or carry a maximum of twenty pounds. (Id. at 14). Her finding, however, is not supported by that of any physician -- instead it corresponds with plaintiff's estimate of the heaviest item she carried before her accident. (See Tr. 92). This reference does not constitute substantial medical evidence; instead, it contradicts the bulk of the medical evidence, including the statement of Dr. Huish in July 2004 that plaintiff was still experiencing difficulty with "lifting, carrying, pushing, pulling, etc." (id. at 248), and Dr. Bouhlev's assessment that she needed pain-relief treatments for her cervical and lumbar spines. In any event, the ALJ was obliged to explain the basis for all aspects of his RFC assessment -- including his finding that plaintiff could lift ten pounds, which is significant because it is a sine qua non for the ability to do sedentary work, as defined in a the SSA regulations -- and he failed to do so. See 20 C.F.R. §§ 404.1567(a), 416.967(a).

Thus, on remand, the ALJ should explain how he arrived at these percentages and pound limits and what medical evidence or testimony in the record supports his determination of plaintiff's RFC.

102

G.    The ALJ Failed to Sustain his Burden Under Step Five of
      the Five-Step Evaluation Framework For Evaluating
      Plaintiff's Disability Claims

Once the ALJ determined that plaintiff could not complete her

past relevant work, he was required, under step five, to determine

whether there was work in the national economy plaintiff can do.

The ALJ failed to adequately address the proof, or lack of proof,

at step five of the sequential analysis.

While plaintiff bears the burden of proof as to the first four

steps -- establishing her severe condition and her inability to

work at her prior occupation -- there is "a limited burden shift to

the Commissioner at step five . . . to show that there is work in

the national economy that the claimant can do; [however] he need

not provide additional evidence of the claimant's residual

functional capacity." Poupore, 566 F.3d at 306; 20 C.F.R. §

404.1560(c)(2).[60]

_____

[60] 20 C.F.R. § 404.1560(c), before it was amended on August
26, 2003, required the Commissioner to "consider [a claimant's]
residual functional capacity together with [her] vocational
factors of age, education, and work experience to determine
whether [she] can do other work[, meaning] jobs that exist in
significant numbers in the national economy" if he found that a
claimant could not perform past work. The Second Circuit
interpreted this to mean that the full burden to prove disability
shifted from the claimant to the ALJ at the fifth step, requiring
the ALJ to prove that the "claimant still retains a residual
functional capacity to perform alternative substantial gainful
work which exists in the national economy", and therefore

103

The ALJ was not required in step five to provide further

---

prohibited the use during step five of an inference drawn during
step four from the absence of medical evidence. Curry, 209 F.3d
at 123 (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).
However, on August 26, 2003, 20 C.F.R. § 404.1560(c) was amended
so that, upon finding that a claimant could not complete her
prior work, the ALJ could "use the same residual functional
capacity assessment we used to decide if you could do your past
relevant work when [he] decided if [claimant could] adjust to any
other work [based on the] residual functional capacity and [her]
vocational factors of age, education, and work experience." 20
C.F.R. § 404.1560(c)(1). To determine whether the jobs that a
claimant could perform existed in "significant numbers in the
national economy (either in the region where you live or in
several regions in the country)", the amended regulation made the
ALJ "responsible for providing evidence that demonstrates that
other work exists in significant numbers in the national economy
that [the claimant] can do, given [her] residual functional
capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2).
However, the regulation explicitly states that the Commissioner
is "not responsible for providing additional evidence about [a
claimant's] residual functional capacity because [the ALJ will]
use the same residual functional capacity assessment that [he]
used to determine if [the claimant could perform her] past
relevant work." Id. The Second Circuit held that the amended
regulation abrogated the standard of review put forward in Curry,
and that an ALJ is not required to "provide additional evidence
of the claimant's residual functional capacity." Poupore, 566
F.3d at 306.

The amended regulation became effective on August 26, 2003.
See Clarification of Rules Involving Residual Functional Capacity
Assessments; Clarification of Use of Vocational Experts and Other
Sources at Step 4 of the Sequential Evaluation Process;
Incorporation of "Special Profile" Into Regulations, 68 Fed. Reg.
51153 (Aug. 26, 2003). Because it is the usual practice when the
SSA amends its regulations to apply the new rule to "all
administrative determinations and decisions made on or after that
effective date, regardless of the date on which an application
was filed", Id. at 51159; see also Vega v. Harris, 636 F.2d 900,
903 (2d Cir. 1981) (new SSA regulations apply to all future
decision by ALJ's even in pending suits), and because the ALJ's
decision was issued on June 15, 2006 (Tr. 18), the new rule
governed both the ALJ's decision and the subsequent Appeals
Committee determination.

evidence to substantiate his determination of plaintiff's RFC made in step four,[61] and instead he could rely on that RFC assessment to determine whether she could perform other jobs that exist in significant numbers in the national economy. The ALJ concluded, based on his RFC assessment, that plaintiff could perform "the demands of sedentary exertion level work which does not require working at or above shoulder level on the right more than 70% of the time or bending/stooping more than 50% of the time" and that she could carry or lift objects up to ten pounds. (Tr. 17).

As the SSA regulations describe, sedentary work denotes a "significantly restricted range of work." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.00(h)(4). It involves "lifting no more than ten pounds and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is one that involves sitting, a certain amount of time walking and standing is often necessary in carrying out job duties." 20 C.F.R. §§ 404.1567(a), 416.967(a). In assessing a plaintiff's capacity to perform work-related physical activities, the claimant's ability to

_____

[61] However, we note, as discussed above, that there were several flaws in the ALJ's RFC determination, and therefore the ALJ's determination that plaintiff's RFC allowed her to perform sedentary work in step five is undermined by his failure to give the appropriate weight to the opinions of her treating doctors, to complete the evidentiary record, to address all significant evidence in the record and to assess plaintiff's credibility with regard to her pain, her ability to sit, and her mental health.

sit, stand, walk, lift, carry, push, pull, reach, handle, stoop and crouch must be considered. 20 C.F.R. § 404.1545(b). As summarized in SSR 96-9p, "an accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource."

In addition, plaintiff's mental health symptoms -- including the noted impact of pain on her psychological status -- potentially constituted non-exertional limitations on her ability to work. Without an explanation by the ALJ of why her mental health problems did not constitute non-exertional limitations, he was obligated to conduct a non-grid assessment of her work capability under step five. It was therefore improper for the ALJ to rely solely on the grids as the exclusive determinant of disability status because these symptoms "may cause a limitation of function beyond that which can be determined on the basis of plaintiff's physiological abnormalities alone. 20 C.F.R. § 404.1535(e). When an individual has non-exertional limitations, "the Commissioner must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which [plaintiff] can obtain and perform." Rosa, 168 F.3d at 78 (quoting Bapp, 802 F.2d at 603).

106

In this situation, it would be necessary for the ALJ to call a vocational expert,[62] submit other evidence of jobs that an individual with her limitations could perform,[63] or to explain fully why plaintiff's limitations are not significant enough to warrant the opinion of such an expert. Cf. Walterich v. Astrue, 578 F. Supp.2d 482, 518 (W.D.N.Y. 2008); Henriquez v. Chater, 1996 WL 103828, at *4 (S.D.N.Y. Mar. 11, 1996) (citing Bapp, 802 F.2d at 606) (explaining that when a claimant's ability to work is limited by non-exertional impairments, the ALJ must consider whether the range of work the claimant can perform is so diminished as to require the introduction of vocational testimony). Because the ALJ found that plaintiff could perform a limited range of sedentary work despite exertional and non-exertional limitations that eroded, to a degree, her vocational base, he was obligated to reference

---

[62] The SSA regulations provide that "[i]f the issue in determining whether [claimant is] disabled is whether [claimant's] work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, [the SSA] may use the services of a vocational expert or other specialist." 20 C.F.R. §404.1566(e). The vocational expert can provide information concerning the impact of plaintiff's RFC upon the full range of sedentary work, examples of occupations that plaintiff can perform with that RFC and citations of the existence and number of jobs in such occupations in the national economy. SSR 96-9p.

[63] The ALJ could also have cited several publications noted a SSA regulations that constitute administrative notice of jobs existing in significant numbers in the national economy. (See id. at 17-18). These publications include the "Dictionary of Occupational Titles," the "County Business Patterns," the "Census Reports," the "Occupational Analyses" and the "Occupational Outlook Handbook." 20 C.F.R. § 404.1566(d)(1)-(5).

107

examples of jobs that she could perform with her physical limitations and provide evidence that such jobs did, indeed, exist. 20 C.F.R. § 404.1560(c)(2). The ALJ erred by failing to take any of these measures.

IV. The Remedy

The SSA explicitly authorizes the court, when reviewing decisions of the SSA, to order further proceedings when appropriate. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 384. Remand is warranted where "'there are gaps in the administrative record or the ALJ has applied an improper legal standard.'" Rosa, 168 F.3d at 82-83 (quoting Pratts, 94 F.3d at 39); cf. Butts, 388 F.3d at 384. Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39; see also Butts, 388 F.3d at 385. If, however, the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of

108

benefits. See, e.g., Carroll, 705 F.2d at 644 (where "reversal is based solely on the [Commissioner's] failure to sustain his burden of adducing evidence of [plaintiff's] capability of gainful employment and the [Commissioner's] findings that [plaintiff] can engage in 'sedentary' work is not supported by substantial evidence, no purpose would be served by remanding the case for a rehearing[.]"); accord Balsamo, 142 F.3d at 82.

For the reasons stated, the Commissioner's decision cannot stand. The question remains whether the case should be remanded for further consideration, or simply for calculation of benefits. In this case, there are certainly gaps in the administrative record, and the ALJ committed a number of legal errors in his findings. Nonetheless, depending on the evidence that would fill these gaps and the supplemental findings that an ALJ might make based on the complete record, it is conceivable that the Commissioner might justifiably find that plaintiff is not disabled. Accordingly, the case should be remanded to the SSA for further proceedings to develop a comprehensive record on the basis of which the ALJ and the Commissioner in turn may make appropriate findings.

## CONCLUSION

For the foregoing reasons, we recommend that plaintiff's motion for judgment on the pleadings be granted in part, that defendant's cross-motion for judgment on the pleadings be denied, and that the case be remanded to the Commissioner for further proceedings consistent with this opinion.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Richard Sullivan, Room 615, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: New York, New York**
**September 10, 2009**

RESPECTFULLY SUBMITTED,

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

111

Copies of the foregoing Report and Recommendation have been mailed today to:

Gabriel Jacob Hermann, Esq.
Ingerman Smith, L.L.P.
150 Motor Parkway
Hauppauge, NY 11788


Susan D. Baird, Esq.
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007